Eldon E. KUHNS, Petitioner,

v.

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,
Respondent.

No. 90–1398.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 15, 1991.

Decided April 12, 1991.

Mary E. Curtin, Minneapolis, Mn., for
petitioner.

Douglas B. Jordan, Sr. Atty., Bd. of Governors of the Federal Reserve System, with
whom Stuart M. Gerson, Asst. Atty. Gen.,

Dept. of Justice, James V. Mattingly, Jr., Gen. Counsel, and Richard M. Ashton, Associate Gen. Counsel, Bd. of Governors of the Federal Reserve System, were on the brief, Washington, D.C., for respondent.

Before: SILBERMAN, WILLIAMS, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Eldon E. Kuhns challenges the Federal Reserve Board's refusal to award him attorney's fees and other expenses under the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504. An individual who has prevailed against a government agency in an "adversary adjudication" may recover fees and expenses if the individual's "net worth did not exceed $2,000,000 at the time the adversary adjudication was initiated" and if the agency's position was not "substantially justified." 5 U.S.C. § 504(a)(1) & (b)(1)(B)(i). Kuhns claims the Board erred in finding him financially ineligible for an award and in ruling that the Board's Division of Banking Regulation and Supervision had carried its burden of justifying the position it took against him.

Proceedings began in January 1988, when the Division issued a notice of intention under the Federal Deposit Insurance Act to remove Kuhns from his position as an officer and director of First National Bancorp, a bank holding company in Arizona, and to prohibit him from participating in the affairs of other financial institutions without the Board's prior written approval. 12 U.S.C. § 1818(e). Three months later and only one week before the date set for an evidentiary hearing, the Division moved to dismiss its notice without prejudice. The Division claimed the hearing might interfere with a pending criminal investigation of Kuhns and that

administrative action would be unnecessary if Kuhns were prosecuted and convicted.

The Board agreed to dismiss, but with prejudice. As the Board saw it, the Division's argument for dismissal without prejudice was less than "compelling." The Board pointed out that the Attorney General of the United States had not requested a rescheduling of the hearing, although the Federal Deposit Insurance Act permitted him to make such a request whenever a removal hearing might interfere with a criminal investigation. *See* 12 U.S.C. § 1818(e)(5) (1988) (to be recodified at 12 U.S.C. § 1818(e)(4) (Supp. I 1989)). Furthermore, the Division's delay in moving for dismissal had caused Kuhns to expend a considerable amount of time and money getting ready for the hearing.

Kuhns then sought attorney's fees and other expenses. The Board rejected his application because he failed to provide reliable financial information showing that his net worth did not exceed $2 million and because the Division's filing against him had been "substantially justified" within the meaning of section 504(a)(1). We sustain the Board's decision on both grounds.

I

Kuhns' argument is that he submitted reliable data to the Board showing his net worth to be less than $2 million. When Kuhns filed his initial application for fees and expenses, he supplied no financial information. Through his attorney, Kuhns simply asserted that his net worth did not exceed $2 million in January 1988 and that "[i]n fact" he "had filed [for] bankruptcy under Chapter 11 of the Bankruptcy Code."[1] The Division, perhaps prompted by this assertion, discovered a disclosure statement Kuhns had filed with the bankruptcy court in August 1987 placing his net worth at $41 million. On the basis of Kuhns' bankruptcy filing and his failure to

---

1. That Kuhns filed for bankruptcy under Chapter 11 is of no particular significance to the question whether his net worth was below the $2 million ceiling. Individuals seeking protection under Chapter 11 need not be insolvent. *See* 11 U.S.C. § 109(a) & (d); *In re Coastal Cable T.V., Inc.,* 709 F.2d 762, 764 (1st Cir.1983); J.

ANDERSON, CHAPTER 11 REORGANIZATIONS § 3.02 & Form 1 (1983). In addition, the accuracy of Kuhns' representations to the bankruptcy court had yet to be determined. Kuhns admitted as much. His attorney told the Board that the bankruptcy court was itself "grappling" with many issues affecting his net worth.

furnish any evidence supporting his claim of financial eligibility, the administrative law judge denied his application. On his motion for reconsideration, Kuhns explained that his August 1987 bankruptcy filing, which listed many "contingent assets," including potential recoveries in lawsuits, was not designed to provide "reliable information" about his "realizable net worth." Kuhns then presented another statement purportedly showing a negative net worth of $4,026,007 in August 1987, and a negative net worth of $1,404,132 in October 1988. The statement, which apparently was also prepared for the bankruptcy court, was captioned "Summary of Assets and Liabilities at Liquidation Value August 15, 1987 and October 11, 1988." This satisfied the administrative law judge of Kuhns' financial eligibility.

On review the Board found Kuhns' latest statement unreliable because it did not reveal the basis on which Kuhns had valued his assets and liabilities. The Board sent the case back to allow Kuhns an opportunity to submit a new net worth statement "prepared in accordance with generally accepted accounting [principles] ('GAAP'), by an independent auditor if possible, or, if GAAP are not used, a description of the principles used in valuation of assets and liabilities and a statement that these principles were applied uniformly in the preparation of the net worth statement." Instead of submitting a new net worth statement, Kuhns resubmitted the August 1987/October 1988 statement the Board found unacceptable and an affidavit reciting that some of his assets had been valued on the basis of GAAP.[2] The Board ruled that Kuhns had failed to establish his financial eligibility for an award of attorney's fees.

Our review of the Board's decision is limited to determining whether there is substantial evidence to support it. 5 U.S.C. § 504(c)(2). Both sides agree that "net worth," although undefined in EAJA, means total assets less total liabilities. Kuhns complains that the Board has yet to adopt uniform procedures for EAJA applications, but we fail to see how this caused him any harm. Kuhns had three bites at the apple, first upon his initial application, again on reconsideration and once again after the Board's remand of the case. On the last occasion the Board instructed him to follow GAAP,[3] or to explain why he was not doing so. Kuhns claimed to have complied with the instruction. The question for us is whether the Board was warranted in finding that his financial statement fell short of what the Board reasonably required.

On that score, Kuhns thinks his affidavit sufficiently explained the principles he used in reporting his liabilities. But it did no such thing. The affidavit said only:

The liabilities of E.E. Kuhns represent the amounts of unsettled claims filed in this Chapter 11 Reorganization.

The principles utilized in valuing the assets and liabilities of E.E. Kuhns have been uniformly applied consistent with past practice.

Even Kuhns' brief in this court does not reveal the principles he followed in determining what liabilities to report and in what amounts. We agree with the Board that whatever accounting system Kuhns was using, it was not GAAP. Against $6,154,702 in assets as of August 15, 1987, he listed a total of $10,180,709 in liabilities. But according to the schedule attached to the August 1987/October 1988 statement, each of these "liabilities" was either "con-

---

**2.** Kuhns' statement setting forth the *liquidation* values of assets, while perhaps in conformity with bankruptcy practice, *see* G. Newton, Bankruptcy and Insolvency Accounting: Practice and Procedure 504–12 (3d ed. 1985), raises an immediate question about his compliance with GAAP. Financial statements prepared in accordance with GAAP assume a *going concern. See* Financial Accounting Standards Board, Accounting Standards: Original Pronouncements 12, at ¶ 2 (1988) (Accounting Research Bulletin No. 43).

**3.** *See City of Brunswick v. United States,* 849 F.2d 501, 503 n. 2 (11th Cir.1988), *cert. denied,* 489 U.S. 1053, 109 S.Ct. 1313, 103 L.Ed.2d 582 (1989); *American Pacific Concrete Pipe Co. v. NLRB,* 788 F.2d 586, 590–91 (9th Cir.1986); *Continental Web Press, Inc. v. NLRB,* 767 F.2d 321, 323 (7th Cir.1985).

tingent" or "disputed" or both. As the Board pointed out, GAAP does not permit the recording of all contingent liabilities. Contingencies are classified into three categories: probable, reasonably possible, and remote. Financial Accounting Standards Board, Statement of Financial Accounting No. 5, ¶ 3 (Mar. 1975) ("FASB No. 5"). Only those contingent liabilities that are probable and can be reasonably estimated must be recorded on the financial statement. *Id.* ¶ 8. Contingent liabilities that are reasonably possible are simply disclosed in a note to the financial statement. *See id.* ¶ 10; M. MILLER, COMPREHENSIVE GAAP GUIDE 1989, at 6.03 (1988). Remote contingencies are not disclosed.

Into which category Kuhns' contingent liabilities fell was impossible to determine. The Board had an ample basis for concluding that Kuhns had not carried his burden of showing that all were "probable," which is the only way the liability side of his balance sheet could have conformed to GAAP. Despite the Board's instruction to him, Kuhns never represented that, in reporting his contingent liabilities, he was adhering to the generally accepted accounting principles set forth in FASB No. 5. Kuhns' earlier affidavit, filed on reconsideration of the administrative law judge's initial decision, cast further doubt on the reliability of his financial reporting. He there admitted that his bankruptcy filings, which were the source of his August 1987/October 1988 statement, tended to distort the true state of his financial condition by "exaggerat[ing] both my assets and liabilities."

Kuhns maintains that even if all his contingent and disputed liabilities are disallowed, his net worth still would fall well below the $2 million ceiling. That is not accurate. Kuhns assumes that only a portion of his liabilities—those he listed as "unsecured"—should be viewed as contingent. But the liabilities he reported as "secured" were also contingent according to the schedule he submitted. The Board correctly determined that if all of Kuhns' contingent liabilities were disallowed, Kuhns' net worth exceeded the $2 million ceiling during the relevant period, that is,

the "time the adversary adjudication was initiated." 5 U.S.C. § 504(b)(1)(B).

We also reject Kuhns' argument that the Board failed to consider a revised liquidation value summary he submitted to the Board in March 1990. The Board concluded that the summary was not "a reliable presentation of Kuhns' net worth at the relevant time" because it took into account events occurring after the Division initiated proceedings in January 1988. *See* 5 U.S.C. § 504(b)(1)(B)(i).

## II

■ The Board ruled in the alternative that Kuhns was not entitled to fees and expenses because the Division had carried its burden of showing that it was "substantially justified" in bringing the action against him. The Board relied in part upon affidavits and documents it had permitted the Division to introduce in the fee proceeding. Kuhns claims the Board should not have relied on this supplemental material and, in support, invokes the following sentence in 5 U.S.C. § 504(a)(1):

> Whether or not the position of the agency was substantially justified shall be determined on the basis of the administrative record, as a whole, which is made in the adversary adjudication for which fees and other expenses are sought.

Kuhns reads this sentence to mean that only the record consisting of the Division's notice, the pleadings concerning dismissal and the Board's decision dismissing the proceeding with prejudice may be considered for the purposes of EAJA. The Board argues, however, that the sentence contemplates the making of an "administrative record" and that when a proceeding ends before that has been done, as in voluntary dismissals or settlements, section 504(a)(1) does not restrict the agency from considering other material. In support the Board points to language in the House Committee report that appears directly on point. The Report states that when no record has been developed on the merits, the parties may file other material in the fee proceeding with respect to the substan-

tial justification issue. H.R.REP. No. 120, Pt. 1, 99th Cong., 1st Sess. 13 (1985), U.S. Code Cong. & Admin.News 1985, 132.

While the matter is not free from doubt, we think the Board has the better of the argument. Restricting the inquiry to the record would make little sense when there is, in effect, no record. The government has the burden of showing substantial justification for bringing the action. *Charter Management, Inc. v. NLRB,* 768 F.2d 1299, 1301 (11th Cir.1985); *see also Wilkett v. ICC,* 844 F.2d 867, 871 (D.C.Cir.1988). To confine the inquiry to the pleadings when the matter is brought to a close by a voluntary dismissal would be to place the government at a disadvantage Congress could not have intended. The Supreme Court in *Pierce v. Underwood,* 487 U.S. 552, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988), which arose under the comparable EAJA provisions governing fee awards in civil actions brought for or against the United States or a federal agency (28 U.S.C. § 2412), held that when a case ends in a settlement it is not enough to examine the terms of the settlement agreement. The "reasons for the settlement" must also be evaluated in assessing the strength or weakness of the government's position. 487 U.S. at 568, 108 S.Ct. at 2551. Yet those reasons will rarely, if ever, appear in the record.[4] There is of course the danger that the fee proceeding, if allowed to go beyond the pleadings, will turn into another major litigation. *See Commissioner, INS v. Jean,* —— U.S. ——, 110 S.Ct. 2316, 2321, 110 L.Ed.2d 134 (1990). But the chances of that occurring are minimized when the agency permits the parties to supplement the record only by filing affidavits or documents relating to whether the charges were warranted. To bar consideration of such additional material would, in the words of *Underwood,* "not only distort the truth but penalize and thereby discourage

useful settlements." 487 U.S. at 568, 108 S.Ct. at 2552. The same may be said about voluntary dismissals. Changes in agency policies or priorities, lack of resources, or developments outside the agency's control, rather than the absence of evidence or legal support, may cause the government to drop a proceeding it reasonably expected to win. For these reasons, the Board properly allowed the record to be supplemented in order to determine whether the Division had substantial justification for moving against Kuhns.

■■■■ As to the merits, the Board's task was to evaluate the strength of the Division's case against Kuhns. To show substantial justification for its position, the Division did not have to demonstrate that a large amount of evidence supported it. So long as the Division's removal notice was "justified in substance or in the main" (*Underwood,* 487 U.S. at 565, 108 S.Ct. at 2550), Kuhns was not entitled to attorney's fees. The Division's removal notice was so justified.

The notice contained four principal allegations. The first was that Kuhns violated the law, engaged in unsound banking practices, and breached his fiduciary duty to First National Bancorp by granting Norman Dean and Thomas Rapp options to purchase his stock· in First National Bancorp and a subsidiary, First National Bank. The Board had approved First National Bancorp's holding company application based on Kuhns' representation that Dean and Rapp would have "no further relationship" with First National Bank. In the fee proceeding, Kuhns did not deny that he had made this deal with Dean and Rapp. Rather, he explained that these were only options and could be exercised only with prior Board approval. The Board expressed considerable doubt about the legal accuracy of Kuhns' explanation. But even if Kuhns

---

4. Like the sentence from 5 U.S.C. § 504(a)(1) quoted in the text, 28 U.S.C. § 2412(d)(1)(B) provides that whether the position of the United States was "substantially justified" "shall be determined on the basis of the record (including the record with respect to the action or failure to act by the agency upon which the civil action is based) which is made in the civil action for

which fees and other expenses are sought." *See Commissioner, INS v. Jean,* —— U.S. ——, 110 S.Ct. 2316, 2319–20, 110 L.Ed.2d 134 (1990). The settlement in *Underwood* occurred in 1980, before the relevant language of § 2412(d)(1)(B) was in effect. That provision, and its counterpart relating to agency adjudication, were added in 1985.

were proven correct after a full adjudication, the Division was justified in making the allegation in its removal notice and the Board so found.

The second allegation concerned First National Bank loans totalling $900,000 to Dean and Rapp. The Division charged that the proceeds of the loans went to Kuhns so that he could repay loans at another bank, and that Kuhns influenced the bank to make the loans even though he knew that Dean and Rapp would have difficulty repaying them. In the fee proceeding, Kuhns presented the Board with a deposition of First National Bank's president purporting to show that the president took "full responsibility" for the loans. But as the Board found, the Division had reason to disbelieve the accuracy of this account. The president also had testified in connection with the pending criminal investigation that he had no knowledge of the Dean and Rapp loans.

The third allegation was that Kuhns, in order to evade the bankruptcy laws, unlawfully altered bank records, substituting his wife's name for his as payee on a $100,000 First National Bancorp promissory note. In an affidavit submitted by the Division, a bank examiner for the Federal Reserve Bank of San Francisco recited ample evidence to support the allegation, including the finding of a forensics expert that the two pages of the note had been typed on different typewriters. Kuhns' explanation—that the note actually was intended for his wife and that no harm to the bank could · have resulted from switching payees—did not render the Division's charge unwarranted.

The fourth allegation was that Kuhns, in connection with First National Bancorp's bank holding company application, falsely represented to the Board that $1 million in long-term convertible debentures would be issued and that he would purchase a portion of them. In his affidavit, the bank examiner stated that instead First National Bancorp ultimately obtained a $1 million short-term loan, pledging as collateral the stock of its most valuable asset—First National Bank. Kuhns maintains that the Board ignored his side of the story, but that is not so. Kuhns submitted minutes of the board of directors meeting to show that he did not vote on the short-term loan. The Board looked at these but found the Division's allegation justified. The minutes themselves revealed that Kuhns supported the transaction. Moreover, First National's 1985 annual report, signed by Kuhns, stated that the company had "convertible debentures payable" even though none were issued.

The short of the matter is that the Board carefully considered and weighed all of the evidence. It made findings and set forth the reasoning behind them. Its conclusion that the Division's position was substantially justified is amply supported by the evidence. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).

■ Kuhns' final argument is that the Division was not substantially justified in moving for voluntary dismissal prior to a full evidentiary hearing. But the Division's position cannot be viewed as unjustified simply on the ground that proceedings were voluntarily terminated on terms unfavorable to it. That is one of the points of *Underwood.* 487 U.S. at 568–69, 108 S.Ct. at 2551–52. Furthermore, substantial justification cannot be determined by focusing exclusively on the Division's filing of the motion to dismiss. The "position of the agency" is to be measured as a whole, not by reference to "separate parts of the litigation, such as discovery requests, fees or appeals." *See Jean*, 110 S.Ct. at 2320–21. So viewed, the Division's motion to dismiss did not render its position any less justified. The Division was concerned about interfering with a prospective criminal prosecution, and the waste of having multiple proceedings. That a criminal investigation existed at the time the removal notice was filed did not require the Division to stay its hand. As the Board recognized, criminal investigations do not necessarily result in prosecutions. To require the Board either to cede authority at the remotest sign of criminal enforcement or to speculate about the intentions of criminal au-

thorities would severely hamper the effectiveness of banking regulation.

The petition for review is therefore denied.