## HOOSIER SPLINE BROACH CORP., Plaintiff,

v.

## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Defendant.

### No. IP 98–1044–C–Y/G.

United States District Court, S.D. Indiana, Indianapolis Division.

Sept. 15, 1999.

Marcie R. Horowitz, Barnes & Thornburg, Indianapolis, IN, for Plaintiff.

Carolyn Dick, U.S. Environmental Protection Agency, Washington, DC, Robin M. Richardson, Environmental Defense Section, U.S. Dept. of Justice, Washington, DC, John Tielsch, Assistant Regional Counsel, U.S.E.P.A., Chicago, IL, for defendant.

### ENTRY ON PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

YOUNG, District Judge.

Petitioner Hoosier Spline Broach Corp. ("Hoosier") asks this court to vacate the

final action by the Environmental Protection Agency ("EPA") denying Hoosier's demand for attorneys' fees under the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504. The EPA initially charged Hoosier in four Counts with violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6924, and regulations thereunder. The case was settled without a hearing with three of the four Counts dismissed with prejudice, the remaining Count amended, and a civil penalty of $3,000.00 assessed.

Following settlement, Hoosier, as a prevailing party, filed its demand for attorney fees under the EAJA seeking approximately $67,000.00 in fees. The Presiding Officer of the Environmental Protection Agency ("EPA") determined that the EPA had shown·that it was "substantially justified" in maintaining an administrative Complaint against Hoosier prior to September 1994. However, the Presiding Officer found that the EPA had not shown it was "substantially justified" in its continued pursuit of Hoosier *after* September 1994, when Hoosier succeeded in certifying its waste as a "special" (nonhazardous) waste under Indiana law. The Presiding Officer thus issued a Recommended Decision awarding Hoosier its attorneys' fees incurred after September 1994. The fee award totaled $16, 891.35.

The EPA appealed the Presiding Officer's ruling to the EPA's Environmental Appeals Board ("EAB"). The EAB reversed the Presiding Officer's decision, concluding that the EPA had, indeed, proven that its position was "substantially justified" both before and after September 1994 and that no fee award was warranted. This appeal followed.

Both parties now move for summary judgment. The court, having read and reviewed the parties' motions, the applicable law, the portions of the administrative record designated by each party, and being otherwise duly advised, now finds that the EPA's motion should be **granted**, and

consequently, Hoosier's motion should be **denied**.

This court has jurisdiction to review the merits of the underlying decision of the EPA's RCRA enforcement action pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 6976, and 5 U.S.C. § 703.

## I. Statutory Background

The Resource Conservation and Recovery Act was enacted by Congress in 1976 "to establish a comprehensive federal program to regulate the handling of solid waste." *Environmental Defense Fund v. EPA,* 852 F.2d 1309 (D.C.Cir.1988). Under subtitle C of the RCRA, 42 U.S.C. §§ 6921–6939e, the treatment, storage, and disposal of hazardous waste can only be undertaken pursuant to a permit that specifies the conditions under which the waste will be managed. 42 U.S.C. § 6925.

RCRA section 3008(a)(1) authorizes the EPA to enforce any requirement of RCRA subtitle C. 42 U.S.C. § 6928(a)(1). Violations of the RCRA, including applicable federal and authorized state regulations (*see* 42 U.S.C. § 6926), are subject to the assessment of civil or criminal penalties and compliance orders. 42 U.S.C. § 6928(a) & (d).

The regulations pertinent to this case provide that waste is considered a hazardous waste if it exhibits, *inter alia,* the characteristic of toxicity, using the Toxicity Characteristic Leaching Procedure ("TCLP"). 40 C.F.R. §§ 261.24(a), 260.20 & 260.21. The regulations further provide that a waste containing chromium has the characteristic of toxicity if an extract from a representational sample of the waste contains chromium concentrations at or greater than 5.0 mg/l. Waste containing such concentrations of chromium is assigned EPA hazardous waste number D007.

## II. Facts

1. Hoosier manufactures steel precision cutting tools used in airline and auto-

mobile industries at its Kokomo, Indiana facility ("Facility").

2. Hoosier's manufacturing process produces two different waste products: a "grinding sludge" from a Blanchard machine and "dry grinding dust" from machines using dust collection.

3. For two years, from February 1990 until February 1992, Hoosier discarded its grinding sludge as nonhazardous waste in a waste pile at its Facility.

4. On October 28, 1991, Hoosier applied to the Indiana Department of Environmental Management ("IDEM") for a Special Waste Permit that would allow it to dispose of its grinding sludge as nonhazardous waste.

5. Indiana's special waste regulations require that the applicant demonstrate that the waste samples submitted be representative of that waste and state:

Waste analyses submitted to the commissioner for review must be accompanied by sufficient documentation of representative sampling and quality assurance/quality control ("QA/QC") information to establish that the applicable procedure was utilized correctly.

Ind. Admin. Code Title 329, r.2–21–14(c).

6. As required by that regulation, Hoosier's application included analytical data relating to the waste pile. The analytical data consisted of four separate test samples taken from the waste pile between October 1990 and September 1991.

7. IDEM made a statistical analysis of the four test results and concluded that the waste contained TCLP[1] Chromium in excess of the regulatory limit of 5.0 mg/l, making it a D007 characteristic waste.

8. IDEM reviewed Hoosier's quality control "QA/QC," and "determined that the QA/QC was O.K."

9. On January 9, 1992, IDEM denied Hoosier's application.

10. IDEM's letter of denial provided that:

This denial is based on the analysis of chromium submitted with the application, which shows the sludge to be a D007 characteristic hazardous waste according to 329 IAC 3–5–5. The upper confidence level . . . for the chromium is in excess of the hazardous waste level.

11. Consequently, on February 21 and 22, 1992, IDEM conducted a RCRA compliance inspection at Hoosier's Facility.

12. The IDEM inspector inspected Hoosier's grinding sludge waste pile and reported that Hoosier also disposed of waste coolant on the waste pile.

13. The IDEM inspector also discovered runoff from this waste pile into a nearby cornfield.

14. The IDEM inspector identified the waste pile as a hazardous waste stream, exhibiting toxicity for chromium.

15. After the first day of inspection, Hoosier dismantled the waste pile and placed it into eighty-five 55–gallon drums, marked them as hazardous waste, and shipped them offsite for disposal as hazardous waste.

16. Subsequently, Hoosier continued to treat its grinding sludge waste as hazardous waste and manifested and disposed of it as hazardous waste.

17. From July 1992 through December 1993, Hoosier sampled its grinding sludge waste stream seventeen times. As the waste pile had been removed, these samples were collected from the point of generation of the waste.

18. Test results from at least two of these samples revealed that they contained chromium in amounts that exceeded the chromium regulatory limit.

19. As a result of IDEM's inspection, the EPA sent Hoosier an Information Request as part of the EPA's investigation of the source, nature and extent of hazardous

1. TCLP stands for "Toxicity Characteristic    Leaching Procedure."

waste containing chromium at Hoosier's Facility.

20. In response to the EPA's request, Hoosier submitted Material Safety Data Sheets ("MSDS"). The MSDS state that Hoosier's feed stock steel for its manufacturing operations contained three to four percent chromium.

21. On June 30, 1993, the EPA filed a four-count Complaint against Hoosier for violations of RCRA and state regulations in connection with Hoosier's grinding sludge waste pile.

22. The EPA's Complaint alleged four violations with respect to Hoosier's hazardous waste pile: (1) Count One identified Hoosier's failure to make a hazardous waste determination, see 40 C.F.R. § 262.11, that Hoosier's failed to submit a hazardous waste notification, see 40 C.F.R. § 265.12, and that Hoosier stored and disposed of hazardous waste without an EPA identification number, see 40 C.F.R. § 265.11; (2) Count Two alleged that Hoosier stored hazardous waste without a RCRA permit or acquiring interim status during the period from September 29, 1990, until May 29, 1992; (3) Count Three alleged that Hoosier failed to meet operating standards for treatment, storage and disposal facilities, see 40 C.F.R. pt. 265; and (4) Count Four alleged that Hoosier failed to meet operating standards for waste piles, see 40 C.F.R. §§ 256.251, 265.253.

23. The EPA's Complaint sought injunctive relief in the form of a compliance order requiring Hoosier to make a hazardous waste determination, cease all unauthorized hazardous waste activities, comply with RCRA standards applicable to owners of hazardous waste piles, and submit a closure plan for the waste pile.

24. The EPA's Complaint also proposed a civil penalty of $825, 509.00, computed in accordance with the EPA's penalty policy.

25. The EPA computed the penalty based on 180 days of violation in accordance with the 1980 RCRA Penalty Policy.

26. Subsequently, from August 23, 1993 through September 1994, the EPA and Hoosier attempted to settle the case.

27. As a result, the parties requested extensions of time to file their prehearing exchanges.

28. In March, 1994, the parties filed prehearing exchanges.

29. The EPA's prehearing exchange stated that the EPA intended to have numerous experts and witnesses testify, including: IDEM inspectors and scientists; EPA Waste Management scientists; and an expert quality control coordinator.

30. In September 1994, IDEM granted Hoosier's second application for special waste permit to treat its grinding sludge as nonhazardous waste. IDEM's 1994 permit was based on a new application and new data samples.

31. Settlement efforts broke off in late September 1994 and the case was almost completely inactive until May 1995. Hoosier's records provide that its attorneys billed only 1.5 hours during this time.

32. On June 12, 1995, an evidentiary hearing before an EPA administrative law judge ("ALJ") was scheduled for July 26, 1995.

33. On July 10, 1995, the parties informed the ALJ that they had reached a settlement.

34. On July 12, 1995, the EPA voluntarily dismissed with prejudice Counts Two, Three, and Four of the Complaint.

35. The EPA amended Count One to allege a failure to determine whether or not Hoosier's waste was actually hazardous.

36. On September 29, 1995, ALJ Frank W. Vanderheyden approved a Consent Agreement and Final Order resolving the Complaint.

37. The Consent Agreement required Hoosier to pay a $3,000.00 penalty for failure to make a hazardous waste determination of its grinding sludge.

38. The Consent Agreement also required Hoosier to comply with RCRA in the future and provide a current hazardous waste determination of its grinding sludge to the EPA.

### III. The EPA's Decision

#### A. The Administrative EAJA Proceedings

On August 21, 1995, Hoosier filed an application for an award of attorneys' fees and expenses under the Equal Access to Justice Act, 5 U.S.C. § 504. The Presiding Officer determined that the EPA had shown it was "substantially justified" in its pursuit of Hoosier until September 1994 because of "the fact that the waste initially tested as hazardous, and continued to test hazardous on some of the early subsequent tests." (Recommended Decision of the Presiding Officer, Plaintiff's Ex. D ("Ex. D"), p. 14). However, once Hoosier was awarded the special waste permit in September 1994, the Presiding Officer found "that the EPA's case became considerably weaker." (Ex. D, p. 15). The Presiding Officer reasoned:

> It is true, as the EPA points out, that the certification was for the "current" wastestream as distinguished, presumably, from what had been generated at the time of the inspection. The EPA does not point to any evidence in the record, independent of the test results, indicating that the waste now being generated should not also be considered representative of the waste generated at the time of the inspection. It should, then, have become clear to the EPA it was *unlikely to prevail on the merits.*

(Ex. D, p. 15). Based upon this finding, the Presiding Officer found that the EPA should have settled soon after Hoosier was awarded the special waste permit.

In addition, the Presiding Officer rejected the EPA's proffered reasons for settlement[2] and found the EPA was *unjustified* in delaying settlement. Thus, the Presiding Officer issued a Recommended Decision awarding Hoosier its attorneys' fees incurred after September 1994. (Ex. D., pp. 16–17).

#### B. Appeal to the Environmental Board

The EPA appealed the Presiding Officer's ruling to the EPA's Environmental Appeals Board ("EAB"). The only issue the EPA appealed was the Presiding Officer's finding that the EPA lacked substantial justification for its position after September 1994. After a de novo review of the Presiding Officer's decision, the administrative record, and after hearing oral argument, the EAB reversed the Presiding Officer's decision, concluding that the EPA had, indeed, proven that its position was "substantially justified" both before and after September 1994 and that no fee award was warranted. (Final Decision of the Environmental Appeals Board, Plaintiff's Ex. E ("Ex.E"), p. 55).

In particular, the EAB found that the Presiding Officer had erroneously concluded that the EPA should have settled after IDEM issued a permit in September 1994. First, the EAB reasoned that the EPA was not required to settle or dismiss its hazardous waste claims after IDEM issued the special waste permit in September 1994, because the EPA's Complaint concerned only waste generated and placed in Hoosier's waste pile between 1990 and 1992. (Ex. E, pp. 31–32). The EAB con-

---

**2.** The EPA's proffered reasons for settlement were: (1) an intervening enforcement action in another case made it less likely the EPA would be successful in obtaining a large civil penalty; (2) a June 1995 EPA policy proposed more lenient civil penalties for small businesses based on an April 1995 Executive Order urging government agencies to be more "flexible" with small businesses; and (3) the terms of the settlement achieved the EPA's goals by deterring RCRA violations.

cluded that the 1994 special waste permit was only probative of the hazardous quality of the waste generated after September 1994, and did not necessarily contradict or refute the evidence obtained in 1991 and 1992 from which it was determined that toxic levels of chromium existed in the waste generated between 1991 and 1992— the waste which was the subject of the EPA's Complaint. (Ex. E, pp. 27–28). Therefore, the EAB concluded that the EPA, based upon the testing performed in 1991 and 1992, had a reasonable basis in fact and in law for both filing and continuing to prosecute its Complaint. (Ex. E, pp. 38–39). Second, the EAB rejected Hoosier's argument that the existence of contradictory evidence in the record demonstrated that the EPA lacked substantial justification. (Ex. E, p. 38). The EAB explained that the mere fact that the record contained some contradictory evidence did not support an award of attorney fees, even if such contradictory evidence would have allowed Hoosier to prevail on the merits in any contested hearing before the EPA. (Ex. E, p. 31). Further, the EAB reviewed the EPA's reasons for settlement and determined that the EPA had plausible reasons for both the timing and the terms of settlement. (Ex. E, p. 39). Finally, the EAB rejected the Presiding Officer's finding that the EPA had improperly delayed settlement, reasoning that both parties were to blame for any delay—a common occurrence civil cases. (Ex. E, pp. 50, 52).

## IV. Argument

### A. Standard of Review

■ The court's determination on appeal may only be "based on the factual record made before the agency." 5 U.S.C. § 504(c)(2). The court may modify an agency's denial of fees only if the court finds the agency's decision was "unsupported by substantial evidence." 5 U.S.C. § 504(c)(2); *Pierce*, 487 U.S. at 559, 108 S.Ct. 2541. Substantial evidence is "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Griffith v. Callahan,* 138 F.3d 1150, 1152 (7th Cir.1998) *quoting Richardson v. Perales,* 402 U.S. 389, 399–400, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

## B. The Equal Access to Justice Act

### 1. Generally

■ The Equal Access to Justice Act, 5 U.S.C. § 504, provides for a prevailing party in an agency's adversary adjudication to recover its attorneys' fees where the agency's position was not "substantially justified." Since the EPA did not appeal the issue of whether Hoosier, as a result of the settlement between it and the EPA, was a prevailing party, the court need only consider whether the EPA's pursuit of Hoosier after September 1994 was not substantially justified.

The EPA bears the burden of proving that its position in the enforcement action taken after September 1994 was substantially justified. The EPA's "position" must be substantially justified not only at the commencement of litigation but throughout the course of the proceedings. *Phil Smidt & Son, Inc. v. National Labor Relations Bd.,* 810 F.2d 638, 641–42 (7th Cir. 1987); *see also Kuhns v. Board of Governors of the Federal Reserve System,* 930 F.2d 39, 44 (D.C.Cir.1991) ("The 'position of the agency' is to be measured as a whole, not by reference to 'separate parts of the litigation, such as discovery requests, fees or appeals.' "). Furthermore, "it is well settled in this circuit that an agency's position is substantially justified [only] if it has a reasonable basis in law and fact" *Phil Smidt & Son, Inc.,* 810 F.2d at 642 (*quoting Temp Tech Indus., Inc. v. National Labor Relations Bd.,* 756 F.2d 586, 590 n. 4 (7th Cir.1985))—that is, if it is "justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988).

### 2. Application of EAJA to Settlement

Although Hoosier did not obtain a final judgment following a trial on the merits, it still falls within the parameters of the Act because a party may be deemed prevailing upon the attainment of favorable settlement terms. *Foster v. Boorstin,* 561 F.2d 340 (D.C.Cir.1977). In determining whether the EPA's position was justified in the context of settlement, the court must consider not only the objective factors—such as the terms of the settlement—but also the actual reasons for settlement. *Pierce,* 487 U.S. at 568, 108 S.Ct. 2541 ("The unfavorable terms of a settlement agreement, without inquiry into the reasons for settlement, cannot conclusively establish the weakness of the Government's position"). "Changes in agency policies or priorities, lack of resources, or developments outside the agency's control" are valid reasons for settlement. *Kuhns,* 930 F.2d at 43 (D.C.Cir.1991).

### C. Issues

### 1. Settlement

### a. Reasons for Settlement

Hoosier first contends the EPA's reasons for settlement were unsupported by substantial evidence, and that therefore, the EAB's decision should be reversed. Based upon a review of the EAB's decision, as well as the designated evidence, the court finds the EPA's stated reasons for settlement—changes in decisional law and internal policy, as well as the fact that the settlement achieved the EPA's enforcement goals—provided a reasonable explanation for the terms and timing of the settlement agreement between it and Hoosier. *See Kuhns,* 930 F.2d at 43 ("[c]hanges in agency policies ... may cause the government to drop a proceeding it reasonably expected to win.").

The court is cognizant of the fact that the terms of settlement were not favorable to the EPA. The fact that the initial assessment against Hoosier of $825,000.00 was reduced to $3,000.00 as a result of settlement does merit the court's attention. However, this fact alone does not negate the court's evaluation of the record. As previously stated, the court must consider not only the terms of settlement, but also the actual reasons for settlement. *See Pierce,* 487 U.S. at 568, 108 S.Ct. 2541. Based upon the record before the court, the court cannot say that the EPA's stated reasons for settlement could not satisfy any reasonable person as a rational basis for settlement. *See id.*

Moreover, while Hoosier contends the reasons for settlement are invalid because they are "unverified statements in the Government's brief," the court finds this argument equally unavailing for two reasons. First, the stated reasons for settlement were made a matter of record at the hearing before the EAB which specifically relied upon the reasons proffered by the EPA in its decision. Accordingly, there is substantial evidence in the record to support the conclusion that the stated reasons for settlement was the actual motivating factor of the EPA in settling the claim. Second, Hoosier failed to properly object to the EPA's reasons. (*See* Ex. E, p. 45 n. 61).

### B. Delay

Hoosier next challenges the EPA's "delay" in settling the claim. As the EAB found, the record supports the conclusion that both the EPA and Hoosier attempted to settle the case. (See Exs. J & K). To the extent that Hoosier claims unreasonable delay after September 1994, the court agrees with the EAB in its conclusion that both parties are partially to blame for the delay, as evidence by the absence of evidence of any contact between the parties from September 23, 1994 until June 1995. (*See* Status Report of the Environmental Protection Agency of January 15, 1994, Plaintiff's Ex. M ("Ex.M")). Moreover, as the EBA concluded, delay is just part of civil practice and is not necessarily indicative of the EPA's dilatory practices. Further, in light of the court's conclusion that

the EPA was substantially justified in proceeding with the administrative action, it cannot be said that any delay in resolving the claim warrants an award of attorneys' fees to Hoosier.

## 2. Burden of Proof

Hoosier contends the EAB erred by improperly shifting the burden of proof. Hoosier contends the EAB's use of words and phrases such as "wreck," "override," "disprove," "fundamentally negate" and "lead inescapably to the conclusion" offer conclusive evidence that the EAB shifted the burden of proof from the EPA to Hoosier. The use of these words and phrases taken from the EAB's decision are found at pages 29, 32 and 33, wherein the EAB discusses why the EPA was justified in pursuing the enforcement action after IDEM's issuance of the special use permit in September 1994. (*See* Ex. E). These words/phrases were used by the EAB in rejecting the argument that the toxicity of the waste generated after September of 1994, classified as nonhazardous, was representative of the toxicity of the waste generated in 1991 and 1992 for which Hoosier was being prosecuted. As more aptly stated by the EAB:

> The special waste permit, which established that waste generated in September 1994 and afterwards could be disposed of as nonhazardous ... simply does not override the substantial evidence outlined above which supports the [EPA's] claims that the waste *in the waste pile* was hazardous. In other words, since the hazardous character of the waste in the pile was the focus of the [EPA's] complaint, and since it is undisputed that the special waste permit applied to waste generated at a much later time, the permit did not, standing alone, disprove that the waste in the waste pile was hazardous.

The court finds the EAB did not improperly shift the burden of proof upon Hoosier. Rather, the EAB was merely explaining why it rejected Hoosier's argument that the waste on Hoosier's property pre–1994 was nonhazardous merely because IDEM issued a special use permit in September 1994.

## 3. The Record As a Whole

Finally, Hoosier contends the EAB erred by failing to consider the record "as a whole" in its evaluation of the EPA's substantial justification in pursuing the enforcement action against Hoosier postpermit (September 1994). *See* 5 U.S.C. § 504(a)(1). The thrust of Hoosier's argument is that the evidence before the EAB required a conclusion that the toxicity of Hoosier's waste generation did not change between the years 1992 and 1994. However, the EAB specifically identified evidence in the record before it which support its finding that the EPA's continued prosecution of the enforcement action following IDEM's issuance of the special waste permit was substantially justified. The specific evidence consisted of: (1) Hoosier's 1990–1991 waste pile samples; (2) IDEM's independent analysis analyzing those samples finding Hoosier's waste pile samples had a confidence level of accuracy; (3) IDEM's 1992 determination that Hoosier's waste pile was hazardous; (4) IDEM's resulting inspection of Hoosier's facility and waste pile; (5) "Hoosier's barreling and shipment for disposal the waste in the waste pile as well as the other grinding sludge generated between February 1992 and February 1994;" and (6) the fact that between July 1992 and May 1993, three additional samples tested hazardous for chromium. (Ex. E, pp. 31–33). As the EAB noted, the evidence brought forth by the EPA supports the EPA's claims "that the waste in the waste pile (at the time the EPA filed the administrative complaint) was hazardous."

In support of its argument that the EPA's continued prosecution was not substantially justified, Hoosier points to conflicting evidence in the record. The evidence they cite is: "(1) an alleged inconsistency in test results for the waste pile samples; (2) questions surrounding

the accuracy of how the samples were handled and tested; (3) the absence of evidence that Hoosier's operations had changed in any material way; and (4) the fact that no other broach manufacturer had ever identified the grinding waste as hazardous." (Ex. E, p. 33).

However, on judicial review of an administrative decision, it is not the function of this court to weigh the evidence and resolve conflicts in the evidence; that function belongs solely to the administrative agency. Rather, this court's review is limited to a determination of whether the administrative record contains substantial evidence supporting the administrative agency's findings and conclusions. Thus, a mere conflict in the evidence does not translate into a finding that the EAB's determination that the EPA's continued prosecution was not substantially justified. *See Jackson v. Chater,* 94 F.3d 274, 279 (7th Cir.1996)(government's denial of social security benefits, based on expert opinion which contradicted other evidence, was substantially justified); *see also Pierce,* 487 U.S. at 566 n. 2, 108 S.Ct. 2541 ("a position can be justified even though it is not correct.") As set forth above, there is substantial evidence in the administrative record supporting the EAB's findings and conclusions, and this court therefore cannot disturb those findings and conclusions even if there does exist conflicts in the evidence. Therefore, the court **grants** the EPA's motion for summary judgment and **affirms** the decision of the EAB.

## V. Conclusion

For the reasons set forth in the court's opinion, the court **grants** the Environmental Protection Agency's Motion for Summary Judgment and **affirms** the decision of the Environmental Appeals Board. Conversely, the court **denies** Hoosier Spline Broach Corporation's Motion for Summary Judgment.