# United States Court of Appeals
## For the First Circuit

No. 07-1757

IN RE: JORGE BARROSO-HERRANS; MADELEINE ROSARIO-FARRULA,

Debtors.
_____

JORGE BARROSO-HERRANS; MADELEINE ROSARIO-FARRULA,

Appellants,

v.

WIGBERTO LUGO-MENDER, CHAPTER 7 TRUSTEE,

Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before
Boudin, Chief Judge,
Lynch, Circuit Judge,
and Keenan,[*] Senior District Judge.

Fernando E. Longo-Quiñones with whom Berríos & Longo Law Offices, P.S.C. was on brief for appellants.
Luisa S. Valle-Castro with whom Carmen D. Conde-Torres and C. Conde & Associates were on brief for appellee.

May 7, 2008

_____

[*]Of the Southern District of New York, sitting by designation.

**BOUDIN**, **Chief Judge**.  In 1996, the Puerto Rico Aqueduct and Sewer Authority ("PRASA") hired Powertronics Electrical and Mechanical Contractor, Inc. ("Powertronics") to manage two construction projects.  The projects were never completed; Powertronics was dissolved; and its owners, Jorge Barroso-Herrans and his wife Madeleine Rosario-Farrulla, filed two law suits in the Puerto Rico courts against PRASA: the law suits blamed the agency for the failure of the projects and their company, and sought over four million dollars in assorted damages.

On the same day as the suits against PRASA were filed-- August 30, 1999--Barroso and his wife ("debtors" or just "Barroso") filed for bankruptcy in the federal bankruptcy court for Puerto Rico, under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 701 et seq. (2000).  The relevant details of their filings are as follows:

- On their list of assets (Schedule B), the debtors included two accounts receivable, from PRASA, for "improvements to sanitary distribution system"--one for "Punta Santiago" and the other for "Aguas Claras" (the sites of the two failed construction projects).  The former was listed as having a value of $102,843.21; the latter, $67,608.98.

- On the same schedule, the debtors included as assets "civil suit KAC 99-1225" and "civil suit KAC 99-1226"--the two suits filed against PRASA--and listed each as having a value of $4,000.  The suits included but were not limited to collection of the accounts receivable.

- On their list of assets claimed as exempt from property of the estate (Schedule C),

-2-

11 U.S.C. § 522(b), Barroso included "Civil Suit KAC 99-1225 Powertronics v. PRASA" and "Civil Suit KAC 99-1226 Powertronics v. PRASA." In the column headed "Value of Claimed Exemption" Barroso wrote $4,000 for each suit.

During the subsequent meeting of creditors, see 11 U.S.C. § 341, the Chapter 7 trustee Wigberto Lugo-Mender was given copies of the complaints in the two pending suits against PRASA. Parties in interest have thirty days from a creditors' meeting to object to any of a debtor's claimed exemptions, Fed. R. Bankr. 4003(b); Lugo filed no objections to the exemptions concerning the two Powertronics suits.

Just over a year later, on February 28, 2001, Lugo requested that the bankruptcy court authorize an agreement he had reached with Barroso and his counsel concerning the prosecution of the two suits: for Barroso's counsel to represent Barroso and the estate jointly in the suits and for the debtors and the estate to split any proceeds from the suits equally after paying counsel a contingency fee. The bankruptcy court agreed to the joint representation but refused to commit in advance to a particular distribution of the proceeds or to counsel's fee arrangement; Barroso's counsel then withdrew and Barroso declined to cooperate with Lugo in pursuing the suits.

At this point, in August 2001, Barroso first asserted in the bankruptcy court that the two suits against PRASA had been entirely exempted from inclusion in the estate and that the estate

therefore had no interest in the suits at all--a position to which Lugo strongly objected. That dispute came to the forefront when Lugo unilaterally negotiated a settlement with PRASA, calling for a payment of $100,000 to the estate in exchange for waiving all of Barroso's claims against the agency.

In December 2002, Lugo presented that settlement to the bankruptcy court for approval; the debtors objected. After extensive proceedings, the bankruptcy court approved it. It held that Barroso had exempted not the law suits but rather only a $4,000 partial interest in each suit, so the trustee could settle the suits and simply pay a total of $8,000 to the debtors. The court also suggested that Barroso had acted in bad faith. The federal district court affirmed and this appeal followed.

When an individual files for bankruptcy, all of his property--including causes of action--becomes property of the estate. 11 U.S.C. § 541. But the debtor is entitled to claim as exempt, and so retain, some assets. 11 U.S.C. § 522(d). The statute enumerates both what kind of assets may be exempted, e.g. an "interest . . . in one motor vehicle," id. § 522(d)(2), and the maximum value of those exemptions, e.g. "not to exceed $2,400 in value," id. Absent objection to a claimed exemption within thirty days of the creditors meeting, the property claimed as exempt belongs to the debtor and not the estate--even if the exemption was improper. Taylor v. Freeland & Kronz, 503 U.S. 638, 642 (1992).

-4-

But, as we have earlier recognized, Taylor does not tell us what has been claimed as exempt--only that whatever has been claimed as exempt is beyond the estate's grasp once the deadline has elapsed. Mercer v. Monzack, 53 F.3d 1, 3 (1st Cir. 1995), cert. denied, 517 U.S. 1103 (1996). In this case the focus is on the "threshold question . . . whether the property in dispute is in fact the property of the estate listed as exempt." Id. Only if the exemptions claimed the full proceeds of both law suits, rather than a $4,000 share in each, does Taylor apply.[1]

The threshold question of what has been claimed calls for interpreting the schedules filed by the debtors. To start, we ask how a reasonable trustee would have understood the filings under the circumstances. How much deference ought to be paid to the bankruptcy judge on this question could depend on the extent to which any disputed facts (as opposed to the interpretation thereof) form the basis for the dispute. Here, the standard of review, which is arguably de novo since no pertinent facts are disputed, cf. Indianapolis Life Ins. Co. v. Herman, 516 F.3d 5, 11 (1st Cir. 2008), does not affect the outcome.

---

[1]Even if Barroso had exempted the law suits in full, the bankruptcy court's finding of bad faith might justify setting aside the exemption, see 11 U.S.C. § 105(a). But the Supreme Court has left that question unresolved. Taylor, 503 U.S. at 645; Mercer, 53 F.3d at 4 n.4. As we shall see, there is no need to reach the matter in this case or to resolve Barroso's claim that the finding of bad faith was tainted by procedural flaws or violated seventh amendment guarantees of a jury as fact-finder.

-5-

Turning then to the filings, a debtor's bankruptcy petition (among other disclosures) lists separately his assets (Schedule B) and those of the listed assets claimed as exempt (Schedule C).  Barroso listed the PRASA accounts receivable on the assets schedule at a total of $170,452.19 and listed each of the two PRASA law suits at issue on his asset schedule and again in the same terms and amounts ($4,000 each) on his schedule of claimed exemptions.  Barroso says that the law suits, consistently listed on both schedules, clearly embraced all of the proceeds of the law suits and not just a $4,000 share of each.

A problem with such a reading is that the $4,000 sum appears to be an implausible full valuation for law suits seeking to collect a vastly greater amount--over $4 million--from a government authority for unpaid invoices.  Barroso explains away that discrepancy as a function of expected value; at the time of filing, he says, the suits were contingent assets worth only $4,000 apiece.  This is a dubious assertion on its face, and even without Barroso's cooperation the suits were settled for $100,000.[2]

But there is an even more serious difficulty with the explanation.  The law suits sought damages for, among other things, the accounts receivable.  In Schedule B those accounts were valued

_____

[2]The selection of the $4,000 figure for each suit makes rather more sense when one considers that the statutory provision under which these exemptions were claimed, 11 U.S.C. § 522(d)(5), includes a cap that at the time worked out to approximately $9,000.

-6-

at $170,452.19 with no discount, even though collection of that sum was <u>also</u> subject to the risk that the suits would fail.  The easy way to reconcile this undiscounted valuation with the valuation of the suits, which sought to collect the <u>same</u> accounts receivable, is to treat the law suit listings as for shares of proceeds.

Had Barroso listed the value of the suits as "unknown"-- as the debtor did in <u>Taylor</u>--or used a nominal sum like $1 as a placeholder, <u>In re Green</u>, 31 F.3d 1098, 1100 (11th Cir. 1994), he would have a much stronger argument.  "Use of terms like '100% [of the property's value],' 'unknown,' 'to be determined,' 'tba' and '$1.00' are red flags to trustees and creditors," 1 <u>Collier on Bankruptcy</u> P. 8.06(1)(c)(ii) (15th ed. rev. 2007), and therefore put them on notice that if they do not object, the whole value of the asset--whatever it might later turn out to be--will be exempt.

But Barroso used none of these "red flag" terms.  In their absence and given the much higher valuations of the accounts receivable, the trustee might reasonably assume that the $4,000 figure reflected not the <u>expected</u> value of the full law suit but rather the <u>face</u> value of a $4,000 interest in the suit's proceeds. After all, the schedules did not contain any explicit indication that expected value calculations were being employed. <u>Cf.</u> <u>Kuhns</u> v. <u>Bd. of Govs. of Fed. Res. Sys.</u>, 930 F.2d 39, 42 (D.C. Cir. 1991) (under accounting principles, "reasonably possible" contingent liabilities are disclosed in a note).

-7-

Courts have no settled or fixed rule on how to approach this type of ambiguity, see In re Anderson, 377 B.R. 865, 876 (B.A.P. 6th Cir. 2007) (collecting cases), although in legal documents ambiguity is traditionally construed against the drafter, United States v. Seckinger, 397 U.S. 203, 210 (1970), and that canon has special force in this context: after Taylor, a failure to object to a claimed exemption has very harsh consequences for the estate, and so it is most fair to place on the debtor the burden of claiming exemptions unambiguously. See In re Hyman, 967 F.2d 1316, 1319 n.6 (9th Cir. 1992).[3]

Anderson itself held that "when a debtor schedules an exemption with identical market and exemption values . . . the debtor is clearly indicating the intention to exempt the property in full, regardless of its actual value," 377 B.R. at 875; but other courts have taken the opposite view, id. at 876, and still others have introduced other factors into the analysis--such as what the parties understood and how they behaved post-filing, e.g., In re Wick, 276 F.3d 412, 416 (8th Cir. 2002). There are many variants and it may be early for courts to construct rigid rules.

It is enough to resolve this case that the trustee's reading of the exemptions as limited to a $4,000 share of the

---

[3]See also 4 Collier on Bankruptcy, supra, at P. 522.05(2)(B) ("Before Taylor, the courts had recognized some leeway for debtors in listing their exempt property. After Taylor, this relative leniency has been more constrained, given the harsh consequences of a failure to object.").

proceeds from each law suit is objectively reasonable: this reading alone reconciles the law suit valuations with the accounts receivable valuations; a $4,000 valuation for an entire multi-million dollar law suit including the accounts receivable makes no sense; and nothing in the schedules suggests that the $4,000 figures reflected an enormous and improbable discount based on the risk that the suits would be lost.[4]

Indeed, if Barroso's schedules truly exempted both law suits in full, Barroso had no reason to negotiate with Lugo over those suits--let alone to offer the estate half of the proceeds. Accord Wick, 276 F.3d at 416. By contrast, on the premise that the estate owned the suits (save for an $8,000 share), the sharing and counsel fee agreement made sense for Lugo because without Barroso's cooperation (as the main witness) the suits would be much more difficult to pursue.

Affirmed.

---

[4]Barroso might perhaps have claimed not a flat sum of $8,000 but rather a percentage share of the proceeds, which may have fluctuated in value from $8,000 since the time of filing (based on how the risks played out relative to expectations). See In re Polis, 217 F.3d 899, 902-03 (7th Cir. 2000) (Posner, J.). In all events, nobody has raised this rather theoretical point.