Janet S. Baer, United States Bankruptcy Judge
Brenda P. Helms, as chapter 7 trustee (the "Trustee") of the bankruptcy estate of *636 Michael K. O'Malley ("O'Malley"), filed a six-count adversary complaint against Metropolitan Life Insurance Company ("MetLife"), O'Malley, Tracy Zellmer ("Zellmer"), and TAMO, LLC ("TAMO"). In the complaint, the Trustee seeks a declaratory judgment that O'Malley's interest in an excess benefit retirement plan is non-exempt property of the estate (Count I), turnover of the proceeds of the retirement plan (Count II), avoidance and recovery of certain post-petition transfers related to the retirement plan (Counts III and IV), an award of damages for willful violations of the automatic stay (Count V), and disallowance of any claims filed by Zellmer or TAMO (Count VI). This matter now comes before the Court on the Trustee's motion for summary judgment on Counts I-V and O'Malley's cross-motion for summary judgment on all six counts of the complaint. For the reasons set forth below, the Court finds that there are no genuine issues of material fact, that the Trustee is entitled to judgment as a matter of law on Counts I-IV, and that O'Malley is entitled to judgment as a matter of law on Count V. Because neither Zellmer nor TAMO filed any proofs of claim, Count VI will be dismissed by the Court sua sponte.[2]
JURISDICTION
The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (E), and (O).
BACKGROUND
The material facts in this case are gleaned from the docket, the pleadings, and the summary judgment statements and responses, as well as the exhibits attached thereto. The following facts are undisputed or have been deemed admitted pursuant to Local Bankruptcy Rule 7056-2(B).
A. O'Malley's Bankruptcy Filing and Schedules
On March 19, 2013, O'Malley filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code (the "Code"). (Bankr. No. 13-10864, Dkt. No. 1.) Subsequently, on April 5, 2013, O'Malley filed schedules B and C on which he failed to disclose any interest in any retirement plans. (Bankr. No. 13-10864, Dkt. No. 13.) About two weeks later, on April 23, 2013, the 341 meeting of creditors was held. (O'Malley Resp. to Tr.'s Stmt. of Undisputed Facts, Adv. No. 16-00552, Dkt. No. 103, ¶ 26.[3] ) During the meeting, O'Malley's attorney stated that O'Malley would amend his schedules to include "a Met Life ... defined benefit pension plan" and that 50% of that plan was pledged to O'Malley's former spouse Debbie O'Malley pursuant to a qualified domestic relations order (the "QDRO"). (Tr. of 341 Meeting, Bankr. No. 13-10864, Dkt. No. 167-1, at 23:22-24:3.) On June 4, 2013, O'Malley filed amended schedules B and C, listing a "Met Life Defined Benefit Pension Plan" of "Unknown" value and claiming exempt 100% of its value. (O'Malley Resp. to Tr.'s Stmt. of Undisputed Facts, Dkt. No. 103, ¶¶ 28 & 29; Am. Sch. C, Bankr. No. 13-10864, Dkt. No. 35, at 5.)
*637 About eight months later, on February 11, 2014, the 341 meeting concluded. (See Bankr. No. 13-10864, Dkt. No. 100.) Thereafter, on March 24, 2014, the Trustee filed a no-asset report. (Bankr. No. 13-10864, Dkt. No. 113.)
B. O'Malley's Retirement Plans: The Traditional Plan and the Auxiliary Plan
O'Malley's employment with MetLife commenced in August 1981 and terminated in April 2005. (O'Malley Dep., Dkt. No. 92-5, at 10:23-11:7; MetLife Add'l Facts, Dkt. No. 108, ¶ 8.) As a MetLife employee, O'Malley participated in two separate retirement plans: the "Metropolitan Life Retirement Plan for United States Employees" (the "Traditional Plan") and the "MetLife Auxiliary Pension Plan" (the "Auxiliary Plan"). (O'Malley Dep., Dkt. No. 92-5, at 71:1-5, 71:20-23, 72:15-17, 75:3-11; MetLife Answer to Tr.'s Compl., Dkt. No. 92-1, ¶ 14.)
The Traditional Plan is intended to comply with the Employee Retirement Income Security Act of 1974 ("ERISA") and the provisions of the Internal Revenue Code governing tax-qualified pension plans. (Traditional Plan, Dkt. No. 92-6, at 3.)
The Auxiliary Plan is a nonqualified excess benefit plan governed by § 409A of the Internal Revenue Code. (Auxiliary Plan, Dkt. Nos. 92-7 & 108-3, at 2;[4] MetLife Resp. to Tr.'s Stmt. of Undisputed Facts, Dkt. No. 108, ¶ 18.) It is "completely unfunded," and "[a]ll obligations under th[e] Plan are entirely separate" from the Traditional Plan. (Auxiliary Plan, Dkt. Nos. 92-7 & 108-3, at 13.) O'Malley's benefits under the Auxiliary Plan are subject to a QDRO issued in 2011, which provides for the assignment of a portion of the benefits to his former spouse. (O'Malley Resp. to Tr.'s Stmt. of Undisputed Facts, Dkt. No. 103, ¶¶ 22-24.)
Pursuant to the Auxiliary Plan, participants can elect from a range of payment options, including different types of contingent survivor annuities. (MetLife Payment History Report, Dkt. No. 92-13, at 7-8.) A contingent survivor annuity provides monthly payments to a participant until his or her death; after the participant's death, a percentage of those payments go to the participant's designated beneficiary. (Id. at 10.) Without an election on file, participants who are married at the time distributions commence receive payments in the form of a default 50% contingent survivor annuity. (MetLife Add'l Facts, Dkt. No. 108, ¶ 2; Auxiliary Plan, Dkt. Nos. 92-7 & 108-3, at 5.)
C. The Commencement of Distributions Under the Auxiliary Plan, the Trustee's Turnover Demands, and the Filing of the Adversary Proceeding
O'Malley and Zellmer married on June 5, 2015. (O'Malley Resp. to Tr.'s Stmt. of Undisputed Facts, Dkt. No. 103, ¶ 30.) On July 23, 2015, O'Malley designated Zellmer as his survivor and elected the 100% contingent survivor annuity payment option under the Auxiliary Plan. (Id. ¶ 31.)
About a week later, on August 1, 2015, O'Malley's benefits under the Auxiliary Plan began, entitling him to net monthly payments of $ 3,614.72 after taxes and payments to his former spouse pursuant to the QDRO. (Id. ¶¶ 34 & 36.) O'Malley *638 directed MetLife to send all of his eligible payments under the Auxiliary Plan to a TAMO bank account. (Id. ¶ 37.) Zellmer is the sole member of TAMO and was in control of TAMO at all times relevant to this adversary proceeding. (Id. ¶ 5.) The payments delivered to the TAMO account (the "TAMO transfers") totaled at least $ 46,991.36 between September 1, 2015 and August 1, 2016. (Id. ¶ 38.) The Court did not authorize the delivery of those payments to TAMO. (Id. ¶ 39.) Zellmer used the funds in the TAMO account to pay household bills, taxes, and other personal expenses. (Zellmer Dep., Dkt. No. 92-4, at 104:8-19.)
On July 13, 2016, MetLife received a turnover letter from the Trustee and complied with the demand by withholding payments under O'Malley's Auxiliary Plan. (Tr. Resp. to MetLife Add'l Facts, Dkt. No. 124, ¶ 15.) Pursuant to the Court's order dated March 16, 2018, MetLife deposited with the Trustee the withholdings for the period August 2016 to February 2018 totaling $ 68,679.68. (Dkt. No. 101.)
On July 14, 2016, the Trustee sent a letter to Zellmer and TAMO demanding turnover of all funds in their possession stemming from the Auxiliary Plan payments, but Zellmer and TAMO failed to comply. (O'Malley Resp. to Tr.'s Stmt. of Undisputed Facts, Dkt. No. 103, ¶¶ 43 & 44.) Thereafter, on August 5, 2016, the Trustee sent a letter to O'Malley demanding turnover of his interest in the Auxiliary Plan (including the proceeds delivered to TAMO), but O'Malley also failed to comply. (Id. ¶¶ 45 & 46.)
On August 31, 2016, the Trustee filed a six-count adversary complaint against MetLife, O'Malley, Zellmer, and TAMO. (Tr. Compl., Dkt. No. 1.) A year and a half later, in February 2018, the Trustee filed the instant motion for summary judgment on Counts I-V of the complaint, contending that: (1) O'Malley's interest under the Auxiliary Plan is non-exempt property of the bankruptcy estate; (2) MetLife, O'Malley, Zellmer, and TAMO are in possession, custody, and/or control of O'Malley's interest under the Auxiliary Plan, and its proceeds are subject to turnover to the estate; (3) the Trustee may avoid and recover both O'Malley's election of the 100% contingent survivor annuity payment option and his direction of payments to TAMO; and (4) O'Malley, Zellmer, and TAMO willfully violated the automatic stay. (Tr. Mot., Dkt. No. 91.) Subsequently, O'Malley filed a cross-motion for summary judgment on Counts I-VI, arguing that: (1) the Trustee's failure to object to O'Malley's exemption bars all counts of the complaint; and (2) the Auxiliary Plan is exempt. (O'Malley Mot., Dkt. No. 105.)
After the motions were briefed, the Court took the matter under advisement. Having reviewed the relevant documents, exhibits, and arguments, as well as applicable case law, the Court is now ready to rule.
SUMMARY JUDGMENT STANDARD
Summary judgment is appropriate if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (made applicable to adversary proceedings by Fed. R. Bankr. P. 7056 ). The primary purpose of summary judgment is to avoid unnecessary trials where no genuine issues of material fact exist. See Trautvetter v. Quick , 916 F.2d 1140, 1147 (7th Cir. 1990). Thus, on a motion for summary judgment, the court must decide, based on the evidence, "whether there is any material dispute of fact that requires a trial." Kodish v. Oakbrook Terrace Fire Prot. Dist. , 604 F.3d 490, 507 (7th Cir. 2010). A factual dispute is "material" only if its resolution might change the outcome under the governing *639 law, and a factual issue is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the material facts are not in dispute, the only issue is whether the moving party is entitled to judgment as a matter of law. ANR Advance Transp. Co. v. Int'l Bhd. of Teamsters, Local 710 , 153 F.3d 774, 777 (7th Cir. 1998).
The party moving for summary judgment bears the initial burden of production to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Outlaw v. Newkirk , 259 F.3d 833, 837 (7th Cir. 2001) (internal quotation omitted); see Celotex Corp. v. Catrett , 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
Once the moving party satisfies its initial burden, the party opposing the motion may not rest on mere allegations or denials; rather, its response must set forth specific facts demonstrating the existence of a genuine issue for trial. See Celotex , 477 U.S. at 324, 106 S.Ct. 2548 ; Anderson , 477 U.S. at 248, 106 S.Ct. 2505 ; Outlaw , 259 F.3d at 837. Facts that are denied without evidentiary support for the denials are deemed admitted. Local Bankr. R. 7056-2(B) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); see Williams v. City of Chi. Bd. of Educ. , No. 10 C 7105, 2012 WL 3023313, at *4 (N.D. Ill. July 24, 2012) ("[T]o the extent that any of [a nonmoving party's] denials do not contain a citation to the record or the citation does not support the denial, those statements of fact by the [moving party are] deemed admitted."). On a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris , 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).
A careful review of the evidence in connection with the parties' motions for summary judgment reveals that there are no genuine issues of material fact in dispute. Thus, the only question to be considered is whether the Trustee or O'Malley is entitled to summary judgment as a matter of law.
DISCUSSION
Preliminary Issue: Whether the Trustee's Complaint Is Barred
Before turning to the complaint, the Court addresses whether the Trustee can bring the adversary proceeding at issue. O'Malley argues that: (1) the Trustee's complaint is barred because she failed to object to the exemption of the Auxiliary Plan in a timely manner; and (2) the Trustee is judicially estopped from challenging the validity of the exemption.[5] As neither of these arguments has merit, the Court finds that the Trustee's complaint is not barred.
A. Bankruptcy Rule 4003(b) and Taylor Do Not Bar the Trustee from Challenging the Exemption Status of the Auxiliary Plan.
O'Malley first argues that the Trustee's failure to object to his claim of exemption within the time permitted under Bankruptcy *640 Rule 4003(b) bars the Trustee's complaint as a matter of law.[6] In this matter, however, the Trustee had no obligation to file an objection because O'Malley failed to properly claim the exemption in the Auxiliary Plan in the first instance.
Under § 541, all property of the debtor becomes part of the bankruptcy estate upon the commencement of a case. 11 U.S.C. § 541(a). Thereafter, a debtor may remove some of the property from the estate by claiming exemptions. 11 U.S.C. § 522(b). To exempt a piece of property, the debtor "shall file a list of property that the debtor claims as exempt," and "[u]nless a party in interest objects, the property claimed as exempt on such list is exempt." 11 U.S.C. § 522(l). If the debtor fails to claim a piece of property as exempt, the rule of inclusion under § 541 controls, and the property remains in the estate. Payne v. Wood , 775 F.2d 202, 204 (7th Cir. 1985).
Subject to exceptions not applicable here, Bankruptcy Rule 4003(b) provides the deadline for objecting to a claimed exemption. Pursuant to that rule, "a party in interest may file an objection to the list of property claimed as exempt within 30 days after the meeting of creditors held under § 341(a) is concluded or within 30 days after any amendment to the list or supplemental schedules is filed, whichever is later. " Fed. R. Bankr. P. 4003(b)(1) (emphasis added).
It is uncontested that the Trustee did not file a timely objection under Bankruptcy Rule 4003(b). Citing Taylor v. Freeland & Kronz , 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992), and In re Kazi , 985 F.2d 318 (7th Cir. 1993), O'Malley argues that the thirty-day time limit under Rule 4003(b) is an absolute bar to the Trustee's complaint. (O'Malley Resp., Dkt. No. 115, at 5-7.) In Taylor , the United States Supreme Court held that a trustee's failure to object to an exemption within thirty days of the initial creditors' meeting "prevent[ed] [the trustee] from challenging the validity of the exemption," even though the claimed exemption had no colorable statutory basis. 503 U.S. at 642-43, 112 S.Ct. 1644. In Kazi , the Seventh Circuit held that under Taylor , "[f]ailure to file a timely objection is an absolute bar to consideration of the merit of the exemptions," "whatever the underlying merits of the debtors' exemptions and the debtors' actual knowledge of the trustee's opposition to their exemptions." 985 F.2d at 320.
Although the Court is bound by both Taylor and Kazi , the Taylor time bar does not apply in this matter because O'Malley failed to claim an exemption of the property at issue in the first place. " Taylor does not tell us what has been claimed as exempt-only that whatever has been claimed as exempt is beyond the estate's grasp once the deadline has elapsed." Barroso-Herrans v. Lugo-Mender (In re Barroso-Herrans) , 524 F.3d 341, 344 (1st Cir. 2008) (citing Mercer v. Monzack, 53 F.3d 1, 3 (1st Cir. 1995) ); Trumble v. Burke (In re Miller) , No. 04-3365, 2013 WL 3808133, at *5 (Bankr. N.D. W. Va. July 21, 2013) ; In re Hall , 453 B.R. 22, 27-28 (Bankr. D. Mass. 2011). What had been claimed as exempt in Taylor was not disputed. 503 U.S. at 640-42, 112 S.Ct. 1644 ("[The debtor] claimed the proceeds from her employment discrimination lawsuit as exempt by listing them in the schedule that she filed under § 522(l)."). Similarly, in Kazi , what had been claimed as exempt was not a question in that appeal. 985 F.2d at 322 ("Debtors placed the pension trust funds on their list of exemptions and stated on *641 their schedules that they claimed the pension trust funds and IRAs as exempt ...."). In contrast, the parties here dispute whether the Auxiliary Plan was claimed as exempt.
To determine whether O'Malley claimed an exemption in the Auxiliary Plan, the Court looks solely at the face of his schedule C. The Supreme Court has warned that " Taylor does not rest on what the debtor 'meant' to exempt. Rather, Taylor applies to the face of a debtor's claimed exemption ...." Schwab v. Reilly , 560 U.S. 770, 788-90, 130 S.Ct. 2652, 177 L.Ed.2d 234 (2010) (citation omitted) (refusing to expand "the universe of information an interested party [including the trustee] must consider in evaluating the validity of a claimed exemption"). "[N]either the Trustee nor the bankruptcy court need struggle to divine a debtor's 'intent' underlying claimed exemptions or look beyond the face of [s]chedule C to figure out what the debtor 'meant' to exempt." Hall , 453 B.R. at 30-31 (citing Schwab , 560 U.S. at 788, 130 S.Ct. 2652 ). Thus, O'Malley's subjective intention is irrelevant.
One purpose of requiring a debtor to list property claimed as exempt is to "allow the trustee to decide which claims to challenge." Payne , 775 F.2d at 206. "[U]nless the claim of exemption contains sufficient detail to put the trustee on notice of questionable assertions, it will not be possible to administer the statutory scheme." Id. "Every [debtor] must do enough itemizing to enable the trustee to determine whether to investigate further." Id. at 207 (emphasis added); see also In re Doyle , 209 B.R. 897, 901 (Bankr. N.D. Ill. 1997).
Notably, any ambiguity in the bankruptcy schedules must be construed against the debtor. "[T]he Code places on debtors [the burden] to state their claimed exemptions accurately ...." Schwab , 560 U.S. at 790 n.17, 130 S.Ct. 2652 ; see also Payne , 775 F.2d at 206 ("[I]t is the debtor's burden to make out the claim of exemption with adequate specificity."); In re O'Shaughnessy , 252 B.R. 722, 738 (Bankr. N.D. Ill. 2000). Moreover, "in legal documents ambiguity is traditionally construed against the drafter, and that canon has special force in this context: after Taylor , a failure to object to a claimed exemption has very harsh consequences for the estate, and so it is most fair to place on the debtor the burden of claiming exemptions unambiguously." Barroso-Herrans , 524 F.3d at 345 (citation omitted); see also Hyman v. Plotkin (In re Hyman) , 967 F.2d 1316, 1319 n.6 (9th Cir. 1992) ("Given that the debtor controls the schedules, we construe any ambiguity therein against him."); Moldo v. Clark (In re Clark) , 266 B.R. 163, 170-71 (9th Cir. BAP 2001) (holding that because the debtor's exemption claim was "ambiguous and imprecise," the subject property was not "automatically exempt under Taylor " when no timely objection was filed).
O'Malley's schedule C is ambiguous at best. Under "Interests in IRA, ERISA, Keogh, or Other Pension or Profit Sharing Plans," O'Malley claimed only one item as exempt: "Met Life Defined Benefit Pension Plan." (Am. Sch. C, Bankr. No. 13-10864, Dkt. No. 35, at 5.) O'Malley now attempts to characterize the Traditional Plan and the Auxiliary Plan as two components of one single "defined benefit retirement plan from MetLife." (O'Malley Resp., Dkt. No. 115, at 3 & 8.) However, the Auxiliary Plan itself plainly states that it is "entirely separate" from the Traditional Plan and that "[a]ll obligations under th[e Auxiliary] Plan are entirely separate from *642 the [Traditional] Plan."[7] (Auxiliary Plan, Dkt. No. 92-7, at 13, 25 & Dkt. No. 108-3, at 13.) Moreover, MetLife, as the employer and administrator of the two retirement plans, admits that the Auxiliary Plan and the Traditional Plan are "two separate retirement plans." (MetLife Resp. to Tr.'s Stmt. of Undisputed Facts, Dkt. No. 108, ¶ 13; MetLife Answer to Tr.'s Compl., Dkt. No. 92-1, ¶ 14.)
Listing one single plan simply did not put the Trustee on notice of an exemption claim of two plans. See Payne , 775 F.2d at 206. It is undisputed that the Traditional Plan is an exempt "Met Life Defined Benefit Pension Plan"; thus, O'Malley's listing of a single plan is "facially within the limits the Code prescribes and raise[d] no warning flags that warranted an objection." See Schwab , 560 U.S. at 789, 130 S.Ct. 2652. Additionally, because the exemption claimed is ambiguous, the Court must construe the ambiguity against O'Malley and thus holds that schedule C does not identify the Auxiliary Plan as exempt.
In a last-ditch effort, O'Malley alleges that even if schedule C insufficiently identified the Auxiliary Plan for purposes of claiming the exemption, the Trustee had an obligation to object to the exemption and request an extension to clarify what property was being claimed as exempt. No authority mandates such an obligation, and the two cases to which O'Malley cites in support of his position are misplaced. In Doyle , the trustee timely objected to the debtor's claims of exemption; thus, whether the trustee had a duty to object to an inadequately claimed exemption and request an extension was not at issue. 209 B.R. at 900. In In re Rosenzweig , schedule C provided the trustee with adequate notice of the debtor's claimed exemptions, "despite the lack of properly scheduling the [exempted property] on an Amended Schedule B." 245 B.R. 836, 841 (Bankr. N.D. Ill. 2000). The Trustee here had no idea that the Auxiliary Plan even existed and certainly had no duty to object to the insufficiently claimed exemption and request an extension.
In sum, O'Malley failed to properly claim an exemption in the Auxiliary Plan on his schedule C. As a result, the Trustee had no obligation to object within the thirty-day period under Bankruptcy Rule 4003(b) in order to preserve the Auxiliary Plan for the estate. Accordingly, the Court finds that the Trustee's complaint is not barred under Taylor.
B. The Trustee Is Not Judicially Estopped from Challenging the Validity of the Exemption.
O'Malley asserts that the Trustee is judicially estopped from bringing this action because she filed a no-asset report. This argument is without merit.
Fundamentally, judicial estoppel is "a matter of equitable judgment and discretion." In re Knight-Celotex, LLC , 695 F.3d 714, 721 (7th Cir. 2012). Because of the "potentially harsh effects" of judicial estoppel, courts must employ this "strong medicine" with caution. Union Carbide Corp. v. Viskase Corp. (In re Envirodyne Indus., Inc.) , 183 B.R. 812, 824 (Bankr. N.D. Ill. 1995) (citing Chaveriat v. Williams Pipe Line Co. , 11 F.3d 1420, 1428 (7th Cir. 1993) ).
The standard for invoking judicial estoppel is "not reducible to any general formulation of principle," but three factors typically inform a court as to *643 whether to apply the doctrine: (1) "a party's later position must be clearly inconsistent with its earlier position"; (2) "the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled"; and (3) "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." Knight-Celotex , 695 F.3d at 721-22 (internal quotations omitted). The three factors are not "a rigid test" that must be applied whenever judicial estoppel is raised; rather, they are "general guideposts to be considered in the context of all [of] the relevant equities in any given case." Id. at 722 (explaining that courts need not "march through" the three factors "one by one").
Although judicial estoppel is appropriate where a party uses intentional self-contradiction as a means of obtaining an unfair advantage, a court should not apply the doctrine "where it would work an injustice, such as where the former position was the product of inadvertence or mistake." Envirodyne Indus. , 183 B.R. at 823 (internal quotation omitted); see also In re Miller , 347 B.R. 48, 55 (Bankr. S.D. Tex. 2006) (refusing to invoke judicial estoppel because the trustee did not know about the claim when issuing a no-asset report).
The third factor-whether the Trustee would derive an unfair advantage or impose an unfair detriment on O'Malley if not estopped-is fatal to O'Malley's judicial estoppel argument. O'Malley was the person who compiled the inadequate schedule C and was solely responsible for unambiguously claiming exemptions. See 11 U.S.C. § 522(l) ; Payne , 775 F.2d at 206. Instead of doing so, O'Malley insufficiently claimed an exemption in a single retirement plan. Had he listed the two retirement plans on his schedule C separately and adequately, he would not need to resort to the "strong medicine" of judicial estoppel because Taylor would have barred this action. As a result, any advantage derived by the Trustee and any detriment imposed on O'Malley cannot be accurately characterized as "unfair."
Moreover, applying judicial estoppel here would adversely affect O'Malley's creditors. As discussed above, O'Malley's inadequately claimed exemption in the Auxiliary Plan failed to put the Trustee on notice of the questionable assertion. Judicially estopping the Trustee from pursuing her complaint now would deprive O'Malley's creditors of potentially valuable assets. Accordingly, the Court finds that it would be inequitable to apply judicial estoppel in this matter. See Biesek v. Soo Line R.R. Co. , 440 F.3d 410, 413 (7th Cir. 2006) (refusing to apply judicial estoppel, where doing so would adversely affect creditors).
O'Malley relies on In re DeGroot , 460 B.R. 159 (Bankr. W.D. Mich. 2011), aff'd , 484 B.R. 311 (6th Cir. BAP 2012), in support of his judicial estoppel argument. That case, however, is distinguishable from the matter at bar. In DeGroot , the court's application of judicial estoppel arose from the actions of the trustee, who "took the position that [an asset] was fully administered to respond to pressure from the United States Trustee" and who "was aware of [the asset] and [even] partially administered it." Id. at 171. Importantly, the DeGroot court emphasized that its holding was based on the unique circumstances of the case and that the court "regard[ed] the Trustee's closing and reopening [of] the case ... as 'cynical gamesmanship.' " Id.
*644 Here, O'Malley has pointed to no evidence to establish that the Trustee acted with "cynical gamesmanship" by filing the no-asset report. It is undisputed that the Trustee did not even know that the Auxiliary Plan existed when she filed the report. In fact, O'Malley himself acknowledged that the Trustee did not know or believe that any retirement plan might be non-exempt. (See, e.g. , O'Malley Resp., Dkt. No. 115, at 3.)
For the foregoing reasons, the Court holds that the Trustee is not barred from challenging O'Malley's exemption in the Auxiliary Plan, nor is she judicially estopped from bringing this action. Accordingly, the Court now turns to the counts at issue in the Trustee's complaint.
Count I: Declaratory Judgment
In Count I of the complaint, the Trustee seeks a declaratory judgment that the Auxiliary Plan and related proceeds are non-exempt and belong to the bankruptcy estate. The uncontested facts in this adversary proceeding establish that the Auxiliary Plan became property of the estate upon O'Malley's voluntary chapter 7 bankruptcy filing, that the plan remains in the estate because O'Malley failed to properly claim an exemption, and that the plan is non-exempt under applicable law. Thus, the Auxiliary Plan and related proceeds constitute property of the estate.
A. The Auxiliary Plan Is Not Exempt Under Illinois Law.
Debtors can select the exemptions provided by either federal law or state law unless a state chooses to "opt out" of the federal exemption scheme. In re Dzielak , 435 B.R. 538, 545-46 (Bankr. N.D. Ill. 2010) ; Rosenzweig , 245 B.R. at 839. Because Illinois has opted out, Illinois debtors must use the exemptions listed in the Illinois exemption statutes. 735 ILCS 5/12-1201 ("[R]esidents of this State shall be prohibited from using the federal exemptions provided in Section 522(d) of the Bankruptcy Code ...."). Therefore, the Court must decide whether the Auxiliary Plan is exempt under Illinois law. Specifically, O'Malley, Zellmer, and TAMO argue that the Auxiliary Plan is exempt under 735 ILCS 5/12-1006 and/or 735 ILCS 5/12-704. As discussed below, neither statute exempts the Auxiliary Plan from the bankruptcy estate.
In interpreting the Illinois exemption statutes at issue, the Court recognizes that "the primary rule of statutory construction is to ascertain and effectuate the legislature's intent. In doing so a court looks first to the statutory language itself. If the language is clear, the court must give it effect and should not look to extrinsic aids for construction." In re Marriage of Logston , 103 Ill.2d 266, 82 Ill.Dec. 633, 469 N.E.2d 167, 171 (1984) ; see also Adams v. Catrambone , 359 F.3d 858, 862 (7th Cir. 2004).
Generally, an exemption statute should be construed liberally in favor of the debtor, because the purpose of exemptions is to protect debtors. In re Barker , 768 F.2d 191, 196 (7th Cir. 1985). More specifically, exemption provisions seek to foster the debtor's fresh start in bankruptcy by protecting him and his dependents from destitution and providing him with the necessary shelter from creditors. See Schriar v. Mose (In re Schriar) , 284 F.2d 471, 473-74 (7th Cir. 1960) ; In re Wright , 156 B.R. 549, 554 (Bankr. N.D. Ill. 1992). The rationale for construing exemption statutes liberally in favor of debtors, however, does not apply here because the Auxiliary Plan is an excess benefit plan, which aims not to protect O'Malley from destitution but to award him amounts beyond the limitations imposed by the Internal Revenue Code and in addition to the Traditional *645 Plan. In any event, liberal construction "does not entail judicial re-drafting, and a court must be mindful to avoid interpreting an exemption statute in a way not contemplated by the legislature in enacting a state's exemption scheme." In re Simpson , 238 B.R. 776, 778-79 (Bankr. S.D. Ill. 1999) (citing Schriar , 284 F.2d at 474 ); see also In re Hoffpauir , 125 B.R. 269, 271 (Bankr. D. Ariz. 1990) ("State exemption statutes should be liberally construed. However, this Court is not authorized to reduce or enlarge the exemptions[ ] or "read into a statute an exemption that is not set forth."). With these caveats in mind, the Court turns to the statutes at issue.
1. The Auxiliary Plan Is Not Exempt Under 735 ILCS 5/12-1006.
Section 12-1006(a) exempts a debtor's interest in a retirement plan only if the plan "is intended in good faith to qualify as a retirement plan" under the Internal Revenue Code. 735 ILCS 5/12-1006(a). The statute provides, in pertinent part, as follows:
§ 12-1006. Exemption for retirement plans.
(a) A debtor's interest in or right, whether vested or not, to the assets held in or to receive pensions, annuities, benefits, distributions, refunds of contributions, or other payments under a retirement plan is exempt from judgment, attachment, execution, distress for rent, and seizure for the satisfaction of debts if the plan ... is intended in good faith to qualify as a retirement plan under applicable provisions of the Internal Revenue Code of 1986 , as now or hereafter amended[.]
Id.
The determinative issue here is whether the key statutory phrase "to qualify as a retirement plan under applicable provisions of the Internal Revenue Code" requires a retirement plan to be tax-qualified. As discussed below, the Court holds that § 12-1006(a) exempts only retirement plans that are "intended in good faith" to be tax-qualified.
a. The Court Agrees with Jokiel 's Holding That the § 12-1006(a) Exemption Applies Only to Tax-Qualified Retirement Plans.
In re Jokiel , 453 B.R. 743 (Bankr. N.D. Ill. 2011), is directly on point. In that case, the court held that "the Illinois exemption [under § 12-1006(a) ] ... applies [only] to retirement plans that are intended to qualify for one or more such forms of preferred tax treatment. " Id. at 747 (emphasis added).
The debtor in Jokiel participated in two retirement plans: one tax-qualified "General Plan" and one non-qualified "Supplemental Plan." Id. at 745. The purpose of the Supplemental Plan was to provide benefits in excess of the limitations imposed by §§ 415 and 401(a)(17) of the Internal Revenue Code. Id. at 745-46. Like the Auxiliary Plan, the Supplemental Plan stated that the employer would make no provision for funding under the plan. Id. at 746.
The Jokiel debtor claimed an exemption under § 12-1006(a) in 100% of the Supplemental Plan, whose value was listed as "unknown." Id. Both the employer and the trustee objected to the exemption, arguing that § 12-1006(a) did not apply because the Supplemental Plan was not "intended in good faith to qualify as a retirement plan under applicable provisions of the Internal Revenue Code." Id. at 746-47 (internal quotation omitted).
The Jokiel debtor's argument relied on § 12-1006(a)'s lack of reference to specific sections of the Internal Revenue Code. Id. at 747. That is, the debtor contended that *646 "because there is no specific reference to a code section, the Illinois statute was intended to refer to the term 'retirement plan' as used throughout the Internal Revenue Code." Id. In other words, the debtor argued, "retirement plan" in § 12-1006(a) includes both tax-qualified and non-qualified plans because the term is not specifically defined in the Internal Revenue Code. Id.
The Jokiel court rejected the debtor's argument, finding that § 12-1006(a) "does not state that it exempts retirement plans 'as defined in' the Internal Revenue Code. It says it exempts retirement plans that are intended in good faith to 'qualify' under the applicable provisions of the tax code." Id.[8] The court noted that "[n]umerous provisions of the Internal Revenue Code contain lists of criteria that must be met for a certain type of asset to qualify for some form of special tax treatment." Id. Accordingly, the court held that the § 12-1006(a) exemption applies only to retirement plans that are intended to be tax-qualified.[9] Id.
The Court agrees with the reasoning in Jokiel. Thus, the Court holds that § 12-1006(a) exempts only retirement plans that are intended to be tax-qualified.
b. The Consistent Interpretation of the Federal Courts in This Circuit Supports the Court's Holding.
O'Malley, Zellmer, and TAMO attempt to discredit other cases discussing § 12-1006(a) by characterizing what those cases say as dicta. Although not binding, dicta can be helpful and instructive. See Resolution Tr. Corp. v. Krantz , No. 89 C 166, 1991 WL 148291, at *3 n.7 (N.D. Ill. July 24, 1991) ("While the discussions in [a particular case] are dicta and therefore not binding on [the court], they are clearly helpful and [the court] rel[ies] heavily on the thoughtful analysis" therein); In re Arguin , 345 B.R. 876, 881 (Bankr. N.D. Ill. 2006) ("In light of the arguments of the parties and the non-binding, but helpful, authorities set forth supra , the Court must consider the instructive dicta from other decisions of the Seventh Circuit."); In re Ross , 210 B.R. 320, 322 (Bankr. N.D. Ill. 1997) (referring to "helpful dicta" when interpreting an Illinois exemption statute); In re Moneer , 188 B.R. 25, 27 (Bankr. N.D. Ill. 1995) (same). Therefore, although they may be dicta, the Court considers the instructive and helpful discussions in the cases on § 12-1006(a) in this circuit.
While not directly on point, the other cases interpreting the Illinois statute reveal that the courts in this circuit consistently deem "tax-qualified" a prerequisite for exempting "retirement plans" under § 12-1006(a). No case law indicating otherwise has been brought to the Court's attention, and the Court's independent research has found none.
In particular, two cases from the Seventh Circuit support the Court's holding.
*647 In In re Weinhoeft, the Seventh Circuit examined the scope of the exemption under § 12-1006 and characterized the statute as allowing "only tax-qualified plans." 275 F.3d 604, 605-06 (7th Cir. 2001). Similarly, in In re Schoonover , the Seventh Circuit deemed "tax-qualified" a prerequisite to the exemption of "retirement plans" under § 12-1006(a). 331 F.3d 575, 577 (7th Cir. 2003). The court held, inter alia , "[t]hat assets freely usable for current consumption may be traced to public benefits does not make them a tax-qualified 'retirement plan' and thus does not support an exemption under § 12-1006." Id. (citing Weinhoeft ).[10]
In addition to the two Seventh Circuit decisions, all of the district court and bankruptcy court cases cited by the parties and those examined independently by the Court characterize the § 12-1006(a) exemption as applying only to tax-qualified retirement plans. See, e.g. , United States ex rel. McCandliss v. Sekendur , No. 03 CV 807, 2014 WL 1018330, at *8 (N.D. Ill. Jan. 27, 2014) (quoting Jokiel 's holding that the "Illinois exemption ... applies [only] to retirement plans that are intended to qualify for one or more such forms of preferred tax treatment"), aff'd , 631 F. App'x 447 (7th Cir. 2015) ; In re West , 507 B.R. 252, 259 (Bankr. N.D. Ill. 2014) (explaining that under § 12-1006(a) a retirement plan "must come within the Internal Revenue Code provisions for tax-qualified retirement plans"); In re Bauman , No. 11 B 32418, 2014 WL 816407, at *17-18 (Bankr. N.D. Ill. Mar. 4, 2014) (holding that a retirement plan was not exempt under § 12-1006(a) because the plan was disqualified from favorable tax treatment); In re Wolf , No. 10 B 41582, 2011 WL 1298277, at *3 (Bankr. N.D. Ill. Mar. 31, 2011) (finding that "the Debtor's annuities [were] not tax-qualified retirement annuities" and thus not exempt under § 12-1006(a)); In re Ellis , 274 B.R. 782, 788 (Bankr. S.D. Ill. 2002) (concluding that an insurance policy was not exempt under § 12-1006(a) because the debtor had "made no attempt to show how her purported annuity qualifie[d] for tax-advantaged treatment under" a specific Internal Revenue Code provision). The consistent interpretation of § 12-1006(a) by the federal courts in this circuit supports the Court's holding that the statute's exemption applies only to retirement plans that are intended to be tax-qualified.
c. An Illinois Appellate Court's Interpretation Supports the Court's Holding.
When construing a state statute, a federal court must defer to a state court's interpretation of that statute. Williams v. Duckworth , 738 F.2d 828, 833 (7th Cir. 1984). "In the absence of a decision by the highest state court, ... [d]ecisions of intermediate appellate state courts generally control unless there are persuasive indications that the highest state court would decide the issue differently." Laborers' Pension Fund v. Miscevic , 880 F.3d 927, 934 (7th Cir. 2018) (internal quotation omitted).
While the Illinois Supreme Court has not addressed whether § 12-1006(a) applies only to retirement plans that are intended to be tax-qualified, an Illinois appellate *648 court found that the state exemption statute "was meant to be the Illinois equivalent of section 522 of the Bankruptcy Code" and that courts should defer to § 522 "in interpreting whether the term 'retirement plan' under section 12-1006 ... includes inherited IRAs." In re Marriage of Branit , 397 Ill.Dec. 107, 41 N.E.3d 518, 523-24 (Ill. App. Ct. 2015). Although Branit does not directly hold that being "tax-qualified" is a prerequisite for retirement plans to be exempt under § 12-1006(a), it is the Illinois appellate court's opinion on the scope of the Illinois statute.
O'Malley criticizes Jokiel for speculating as to "the unstated intent of the Illinois legislature in using the term 'retirement plan' " and "presuming [that] the [Illinois] legislature intended to mirror the policy choices expressed by Congress in setting forth the federal bankruptcy exemptions," the "same exemptions from which Illinois chose to opt out[.]"[11] (O'Malley Resp., Dkt. No. 115, at 19.) This criticism is without merit in light of the Branit court's direction to defer to § 522 of the Code when interpreting § 12-1006.
Section 522 of the Code, the parallel federal exemption to § 12-1006(a), exempts a retirement plan unless it "does not qualify under section 401(a), 403(a), 403(b), or 408 of the Internal Revenue Code." 11 U.S.C. § 522(d)(10)(E)(iii). Thus, according to Branit , the Court should interpret the phrase "applicable provisions of the Internal Revenue Code" in § 12-1006(a) consistent with the tax-qualification provisions listed in § 522(d)(10)(E). This interpretation further supports the Court's holding that § 12-1006(a) exempts only retirement plans that are intended to be tax-qualified.
d. The Auxiliary Plan Is Not Exempt Because It Is Not Intended to Be Tax-Qualified.
O'Malley does not dispute that the Auxiliary Plan is not "tax-qualified." Nor does he contend that the Auxiliary Plan is intended to be "tax-qualified." In fact, the plan itself states that its purpose is to provide the excess amount that would have been payable under the Traditional Plan but for the limitations imposed by §§ 415 and 401(a)(17) of the Internal Revenue Code and § 1.415-2(d)(2) of the Income Tax Regulations.[12] (Auxiliary Plan, Dkt. Nos. 92-7 & 108-3, at 2.) This plainly stated purpose further supports the conclusion that the Auxiliary Plan is not intended to qualify for special tax treatment; rather, it seeks to circumvent the limitations associated with preferred tax treatment. See Jokiel , 453 B.R. at 749 ("[T]he 'intended to qualify' provision is meant to protect debtors who intend to invest in qualified retirement plans that turn out to be nonqualified ...."). Thus, the Auxiliary Plan is not exempt under § 12-1006(a) because it is not intended to be tax-qualified.
2. The Auxiliary Plan Is Not Exempt Under 735 ILCS 5/12-704.
The Auxiliary Plan is also not exempt under § 12-704 because that statute is inapplicable to the present bankruptcy proceeding. Section 12-704 provides, in its entirety, as follows:
Exemptions from garnishment. Benefits and refunds payable by pension or retirement funds or systems and any assets *649 of employees held by such funds or systems, and any monies an employee is required to pay to such funds or systems[,] are exempt and are not subject to garnishment under Part 7 of Article XII of this Act.
735 ILCS 5/12-704 (emphasis added).
The plain language of § 12-704 limits its application to proceedings under Part 7 ("Garnishment") of Article XII ("Judgments-Enforcement") of Act 5 ("Code of Civil Procedure") of the Illinois Compiled Statutes. Because the unambiguous language confines § 12-704's application to garnishment as above, the statute does not apply to the adversary proceeding at bar.[13] See Magill v. Lyons (In re Lyons) , 118 B.R. 634, 641 (C.D. Ill. 1990) ("[ Section 12-704 ] is inapplicable to this bankruptcy turnover proceeding. The quoted statute confines its pension exemption to garnishment proceedings. Because this is not a garnishment proceeding, the statute has no effect."), aff'd , 957 F.2d 444 (7th Cir. 1992), abrogation on other grounds recognized by In re Dunn , 988 F.2d 45 (7th Cir. 1993) ; In re Orr , No. 07-81177, 2008 WL 244168, at *1 n.2 (Bankr. C.D. Ill. Jan. 28, 2008) (stating that § 12-704 "restricts only garnishment"). Accordingly, the Court finds that § 12-704 does not exempt the Auxiliary Plan from the bankruptcy estate.
B. The Auxiliary Plan and Related Proceeds Are Property of the Estate.
Under § 541(a) of the Code, the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Congress intended to bring "anything of value" into the estate. Allen v. Levey (In re Allen) , 226 B.R. 857, 862 (Bankr. N.D. Ill. 1998) (internal quotation omitted). Indeed, "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541." In re Carousel Int'l Corp. , 89 F.3d 359, 362 (7th Cir. 1996) (internal quotation omitted). Even powers that a debtor may exercise for his own benefit are included in the bankruptcy estate. In re Johnson , 513 B.R. 333, 343 (Bankr. S.D. Ill. 2014) ; see also Askanase v. LivingWell, Inc. , 45 F.3d 103, 106 (5th Cir. 1995). Despite this expansive definition of estate property, the trustee does not succeed to any interest greater than that held by the debtor. In re Richardson , 75 B.R. 601, 603 (Bankr. C.D. Ill. 1987).
Although an estate's interest in a pension plan "must be limited to the same extent as the debtor['s] interest," a debtor's retirement plan is property of the estate. See In re Sanders , 969 F.2d 591, 593 (7th Cir. 1992). Thus, the Auxiliary Plan became property of the estate on March 19, 2013, the date of the filing of the voluntary bankruptcy petition, and remains in the estate because it is non-exempt.
Further, under § 541(a)(6), proceeds of property of the estate are also property of the estate, "except such as are earnings from services performed by an individual debtor after the commencement of the case." 11 U.S.C. § 541(a)(6). "Once property enters the estate, it does not matter whether the property changes form." Payne , 775 F.2d at 204. Thus, the full proceeds of any property not claimed as exempt constitute property of the estate. Id. at 204-05. It is uncontested that the proceeds of the Auxiliary Plan are not earnings from services performed post-petition by O'Malley. In fact, O'Malley's employment *650 with MetLife terminated in April 2005, more than ten years before the commencement of payments under the Auxiliary Plan in August 2015. Therefore, the proceeds from the Auxiliary Plan are also property of the estate.
Based on the foregoing, the Court concludes that the Auxiliary Plan and related proceeds are non-exempt property of the bankruptcy estate. Accordingly, the Trustee is entitled to summary judgment on Count I of the complaint. As such, the Trustee's motion will be granted on that count, and judgment will be entered in her favor.
Count III: Avoidance and Recovery of the Payment Election Right[14]
In Count III of the complaint, the Trustee seeks avoidance of the payment election made by O'Malley (the "Payment Election") pursuant to § 549(a), as well as restoration of her right to elect an alternative payment option under the Auxiliary Plan pursuant to § 550(a). As discussed below, the Trustee can avoid the Payment Election as an unauthorized post-petition transfer, and her right to make a payment election thus may be restored. However, the Trustee cannot elect an alternative payment option now because the election period ended before she filed the adversary complaint in 2016.[15] Because the unauthorized Payment Election is avoided, the estate is entitled to a 50% contingent survivor annuity pursuant to the default distribution provision of the Auxiliary Plan.
A trustee may avoid an unauthorized post-petition transfer of estate property under § 549(a).[16] 11 U.S.C. § 549(a). Once the transfer has been avoided, the trustee can recover the transferred property or its value from either the initial transferee or any immediate or mediate transferee.[17] 11 U.S.C. § 550(a).
*651 A. The Trustee's Avoidance and Recovery Power Is Not Restricted by ERISA or § 409A of the Internal Revenue Code (and Related Treasury Regulations), But the Estate's Property Interest Is Limited by the Auxiliary Plan.
In its response, MetLife alleges that the Trustee's power to "nullify" O'Malley's unauthorized election of the 100% contingent survivor annuity and to select an "alternative actuarially equivalent" annuity is restricted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"); 26 U.S.C. § 409A and related Treasury regulations; and the Auxiliary Plan. The Court finds that the Trustee's avoidance and recovery power is not restricted by ERISA or § 409A of the Internal Revenue Code (and related Treasury regulations). However, the bankruptcy estate's property rights are subject to the limitations of the Auxiliary Plan itself.
ERISA does not preempt a trustee's avoidance and recovery power, nor does it provide an exception to or defense against avoidance and recovery of a post-petition transfer. Cf. Heyman v. Woldman (In re Elton Trucking, Inc.) , Bankr. No. 94 B 17989, Adv. No. 95 A 01271, 1996 WL 261059, at *8 (Bankr. N.D. Ill. May 2, 1996) (holding that ERISA does not affect the § 547 avoidance power). First, ERISA explicitly states that nothing in the statute "shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States (except as provided in sections 1031 and 1137(b) of this title) or any rule or regulation issued under any such law." 29 U.S.C. § 1144(d). Thus, aside from exceptions not applicable here, the plain language of the statute mandates that ERISA is subordinate to all other federal laws. Namely, "ERISA's specific provision precluding interferences with the operation of federal law[ ] renders the Bankruptcy Code superior and therefore effective over any ERISA provision to the contrary." Sterling Die Casting Co. v. Local 365 UAW Welfare & Pension Fund (In re Sterling Die Casting Co.) , 118 B.R. 205, 207-08 (Bankr. E.D.N.Y. 1990) (holding that bankruptcy law overrides ERISA, allowing for the recoupment of a preference in violation of ERISA); see also Pulaski Highway Express, Inc. v. Cent. States Se. & Sw. Areas Health & Welfare & Pension Funds (In re Pulaski Highway Express, Inc.) , 41 B.R. 305, 309-10 (Bankr. M.D. Tenn. 1984) (noting that "courts addressing conflicts between ERISA and the Bankruptcy Code have concluded that the Bankruptcy Code controls because of the explicit language of [ 29 U.S.C.] § 1144(d)"). Second, the only exceptions to a trustee's power to avoid and recover a post-petition transfer are listed in §§ 549 and 550. ERISA is not one of those listed exceptions. "[T]he designation of explicitly enumerated exceptions" presumptively "precludes the inference of other exceptions." Elton Trucking , 1996 WL 261059, at *7. If Congress had intended ERISA to limit the avoidance and recovery power, it could have listed ERISA as an exception. See Sterling Die Casting Co. , 118 B.R. at 208 ; Pulaski Highway Express , 41 B.R. at 309-10.
Similarly, the Trustee's power to avoid the Payment Election and to elect an "alternative actuarially equivalent" annuity is not restricted by 26 U.S.C. § 409A and related Treasury regulations. Section 409A and related Treasury regulations cited by MetLife dictate that: (1) accelerated payments are prohibited, and tax penalty occurs in violation of the anti-acceleration provision, 26 U.S.C. § 409A(a)(1)(B) ; 26 C.F.R. § 1.409A-3(j)(1) ; (2) changes in a life annuity must be made at least twelve months before any payment commences, 26 C.F.R. § 1.409A-2(b)(2)(ii) ; and (3) a *652 change to "actuarially equivalent" annuities made before payment commences is not considered a change, id.
None of the provisions relied on by MetLife are applicable to the matter at bar. First, the Trustee does not seek accelerated payments under the Auxiliary Plan but merely an "alternative actuarially equivalent" annuity. (Tr. Reply to MetLife, Dkt. No. 122, at 8.) As for the provisions governing changes, the Trustee's avoidance of the Payment Election nullifies that election and makes it retroactively ineffective. Thus, the Trustee's election of an "alternative actuarially equivalent" annuity is not a "change," because "[c]hange implies making either an essential difference often amounting to a loss of original identity or a substitution of one thing for another." Merriam-Webster's Collegiate Dictionary 190 (10th ed. 2001). To "avoid," in a legal context, means " '[t]o render void' " or " 'to make void or of no effect; invalidate.' " Rosen v. Dahan (In re Hoang) , 469 B.R. 606, 619 (D. Md. 2012) (quoting Coleman v. Cmty. Trust Bank (In re Coleman) , 426 F.3d 719, 726 (4th Cir. 2005) (quoting Black's Law Dictionary 146 (8th ed. 2004), Webster's Encyclopedic Unabridged Dictionary of the English Language 143-44 (2001))); see also Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.) , 394 B.R. 721, 741 (Bankr. S.D.N.Y. 2008) ; McRoberts v. Transouth Fin. (In re Bell) , 194 B.R. 192, 197 n.10 (Bankr. S.D. Ill. 1996) (" 'Avoid' is commonly understood to mean 'to make legally void, annul.' "). The consequence of avoidance "is nullification of the transfer," and "[t]his nullification means that the transfer is retroactively ineffective. " Bell , 194 B.R. at 197 (emphasis added). As a result, the change provisions relied on by MetLife are inapplicable here.
The Court now turns to the Auxiliary Plan itself. Notably, neither of the Supreme Court cases cited by MetLife holds that ERISA plans restrict a trustee's avoidance and recovery power; in fact, neither involves bankruptcy. See Heimeshoff v. Hartford Life & Accident Ins. Co. , 571 U.S. 99, 102, 134 S.Ct. 604, 187 L.Ed.2d 529 (2013) (holding that an ERISA plan's contractual provision limiting the period during which a participant may bring a civil action to recover benefits is enforceable); US Airways, Inc. v. McCutchen , 569 U.S. 88, 106, 133 S.Ct. 1537, 185 L.Ed.2d 654 (2013) (holding that equitable defenses cannot override the clear terms of an ERISA plan). However, the Court agrees with MetLife that the nature and extent of the property interest of the bankruptcy estate in the Auxiliary Plan is limited by the plan's contractual provisions. See Butner v. United States , 440 U.S. 48, 54-55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) ; Vieira v. Pearce (In re Pearce) , 236 B.R. 261, 264 (Bankr. S.D. Ill. 1999) ("[W]hile federal law defines a bankruptcy trustee's avoidance powers, state law governs the determination of property rights."); see also Cox v. Nostaw, Inc. (In re Cent. Ill. Energy Coop.) , 526 B.R. 786, 792 (Bankr. C.D. Ill. 2015) ("When exercising a debtor's rights and interests that are property of the estate, a trustee is subject to the same restrictions and limitations to the same extent as the debtor would have been outside of bankruptcy."), aff'd , No. 15-1118, 2016 WL 299007 (C.D. Ill. Jan. 25, 2016).
A chapter 7 trustee steps into the shoes of the debtor; she takes the debtor's property subject to the same restrictions existing at the commencement of the case. Sanders , 969 F.2d at 593. A trustee can assert no greater rights than the debtor had because "a bankruptcy petition does not expand or change a debtor's interest in an asset; it merely changes the *653 party who holds that interest." Id. "To the extent an interest is limited in the hands of a debtor, it is equally limited as property of the estate." Id. (internal quotations omitted). In other words, a bankruptcy filing does not enlarge any contractual rights or relieve the trustee of any contractual restrictions. Sullivan v. Paul (In re Paul) , 355 B.R. 64, 67-68 (Bankr. N.D. Ill. 2001). "Accordingly, a trustee's interest in a pension plan must be limited to the same extent as the debtor['s] interest." Sanders , 969 F.2d at 593. Therefore, the estate's property rights are limited by the Auxiliary Plan's contractual provisions.
Based on the foregoing, the Court holds that ERISA and § 409A of the Internal Revenue Code (and related Treasury regulations) do not restrict the Trustee's avoidance and recovery power, but the nature and extent of the property rights of the bankruptcy estate are limited by the provisions of the Auxiliary Plan.
B. The Payment Election Is Avoided Under § 549(a).[18]
"Avoidance under § 549(a) has four elements: (1) property was transferred; (2) the property was property of the bankruptcy estate; (3) the transfer occurred after the commencement of the case; and (4) neither the bankruptcy court nor the Bankruptcy Code authorized the transfer." Gierum v. Glick (In re Glick) , 568 B.R. 634, 674 (Bankr. N.D. Ill. 2017) ; Schechter v. Weiler (In re Blair) , 330 B.R. 206, 213 (Bankr. N.D. Ill. 2005). Notably, the burden of proof falls on the party claiming that the transfer is valid, not on the trustee seeking to avoid the transfer. Fed. R. Bankr. P. 6001 ; Blair , 330 B.R. at 213.
Here, O'Malley has failed to show that the transfer at issue was valid, and the uncontested material facts establish that all four elements required for avoidance under § 549(a) have been satisfied. As a result, the Payment Election made by O'Malley will be avoided.
As to the first element, a "transfer" is defined by the Code as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with" property or an interest in property. 11 U.S.C. § 101(54). Like "property of the estate," the definition of "transfer" is intended to be comprehensive and broad in scope. Steinberg v. Rodman & Renshaw, Inc. (In re Carmel) , 92 B.R. 778, 780 (Bankr. N.D. Ill. 1988) ("Congress intended this definition to be all-inclusive and as broad as possible to encompass any surrender of an interest in property, whether the transfer is of legal title or of possession, custody or control."). A transfer occurs when the debtor has ownership of or an interest in a certain property, and that property right is relinquished or lost. See, e.g. , Allan v. Archer-Daniels-Midland Co. (In re Commodity Merchs., Inc.) , 538 F.2d 1260, 1263 (7th Cir. 1976) ("The essence of a transfer is the relinquishment of a valuable property right."). Thus, the surrender of an interest in "property of the estate" constitutes a transfer.
In this matter, by making the Payment Election, O'Malley transferred *654 property of the bankruptcy estate. Under the default 50% contingent survivor annuity payment option, monthly payments to O'Malley during his life would have been $ 5,190.52 (before taxes and payment to his former spouse pursuant to the QDRO), with Zellmer getting $ 2,595.26 per month (before taxes) after O'Malley's death. (MetLife Payment History Report, Dkt. No. 92-13, at 7.) In contrast, under the 100% contingent survivor annuity payment option that O'Malley elected, he received during his life monthly payments of only $ 4,647.19 (before taxes and payment to his former spouse), with Zellmer getting the same amount per month (before taxes) after O'Malley's death. (Id. at 8 & 24.)
By electing the 100% contingent survivor annuity payment option, O'Malley relinquished money to which he was entitled during his lifetime under the Auxiliary Plan. Those relinquished funds, as proceeds under the Auxiliary Plan, are property of the bankruptcy estate. See 11 U.S.C. § 541(a)(6). For that reason, a transfer of property of the estate occurred when O'Malley made the Payment Election. Moreover, because election of a payment option under the Auxiliary Plan is a power that O'Malley was able to exercise for his own benefit, that election right also constitutes property of the estate. See Johnson , 513 B.R. at 343 ; In re Gifford , 93 B.R. 636, 640 (Bankr. N.D. Ind. 1988). When O'Malley made the Payment Election, he stripped the Trustee of her right to exercise that power on behalf of the estate. Therefore, O'Malley's Payment Election was a relinquishment of property of the estate and, thus, a transfer of that property for purposes of the first and second elements under § 549(a).
The remaining elements of the statutory provision have also been established here. As to the third element, it is uncontested that the Payment Election occurred after the commencement of the case. The fourth element is satisfied as well, because the transfer was not authorized by either the Court or the Bankruptcy Code.
In sum, the undisputed facts demonstrate all of the elements required under § 549(a). Accordingly, the Court holds that the unauthorized Payment Election of the 100% contingent survivor annuity under the Auxiliary Plan is an avoidable post-petition transfer under the statutory provision and will be avoided.
C. Avoidance Nullifies the Payment Election and Restores the Election Right to the Estate.
The Code separates the concepts of avoidance and recovery. Levit v. Ingersoll Rand Fin. Corp. (In re VN Deprizio Constr. Co.) , 874 F.2d 1186, 1196 (7th Cir. 1989). In some circumstances, a determination of avoidance ends the litigation because the trustee does not need to "recover." Suhar v. Burns (In re Burns) , 322 F.3d 421, 427-28 (6th Cir. 2003) ; M. Fabrikant & Sons , 394 B.R. at 741 (noting that recovery is unnecessary after avoiding mortgages). Once a transfer is avoided and thus nullified, the property is dealt with as if it had never left the estate. Paris v. Carver (In re Carver) , Bankr. No. 05-17360, Adv. No. 06-1040, 2006 WL 3161765, at *5 (Bankr. E.D. Tenn. Oct. 31, 2006) ; see Bell , 194 B.R. at 197. Notably, "[a]ny transfer avoided" under § 549 of the Code "is preserved for the benefit of the estate but only with respect to property of the estate." 11 U.S.C. § 551. And any interest in property that is "preserved for the benefit of ... the estate under section ... 551" is part of the bankruptcy estate. 11 U.S.C. § 541(a)(4). Thus, recovery is necessary only when the avoidance of a transfer does not fully satisfy the estate. See Burns , 322 F.3d at 427.
*655 In this matter, the avoidance of O'Malley's Payment Election of the 100% contingent survivor annuity is adequate to restore the payment election right to the estate. Like the avoidance of mortgages and liens, avoidance of the Payment Election nullifies that election and thus reinstates the Trustee's right to elect a payment option, subject to the terms of the Auxiliary Plan.
D. The Trustee Cannot Elect Another Payment Option Because the Election Period Had Ended.
Although the Trustee's right to elect a payment option on behalf of the estate is restored, she cannot make a payment election because she waited too long. Under the Auxiliary Plan, the election period had ended when the Trustee brought this adversary proceeding. With the Payment Election nullified, the estate is entitled to the default payment option of the 50% contingent survivor annuity.
As discussed above, the bankruptcy estate's interest in a pension plan is limited to the same extent as that of the debtor. Sanders , 969 F.2d at 593. Here, the Auxiliary Plan mandates that all payment elections be made "prior to the payment commencement date." (Auxiliary Plan, Dkt. Nos. 92-7 & 108-3, at 6.) It is undisputed that monthly payments to O'Malley under the Auxiliary Plan began on August 1, 2015. Accordingly, the election period ended on the same date. More than one year later, on August 31, 2016, the Trustee initiated this adversary proceeding. Therefore, the Trustee cannot make an election now because the right to do so expired pursuant to the terms of the Auxiliary Plan.
Although the Trustee cannot make an election now, the estate is still entitled to the property rights provided by the Auxiliary Plan. Without a payment election, the default provision kicks in. That default provides that O'Malley, as a married participant when the payments commenced, receives benefits pursuant to the 50% contingent survivor annuity.[19] (Auxiliary Plan, Dkt. Nos. 92-7 & 108-3, at 5.) Moreover, pursuant to the Auxiliary Plan, the election of any payment option other than the 50% contingent survivor annuity requires Zellmer's notarized consent as O'Malley's spouse. (MetLife Payment History Report, Dkt. No. 92-13, at 7.) Thus, the estate is entitled to monthly payments under the 50% contingent survivor annuity payment option, after the deduction of applicable taxes and the QDRO payment to O'Malley's former spouse.
In sum, the Payment Election will be avoided, and the Trustee's right to elect an alternative payment option restored. As such, the Trustee's motion for summary judgment as to Count III will be granted. However, the Trustee cannot elect a payment option now because the election period had long since passed when this adversary proceeding was initiated. Thus, the estate is entitled to payments under the default 50% contingent survivor annuity.
Count IV: Avoidance and Recovery of the TAMO Transfers
In Count IV of the complaint, the Trustee seeks avoidance and recovery of *656 the TAMO transfers made by O'Malley post-petition pursuant to §§ 549 and 550, respectively. The Trustee's motion for summary judgment on Count IV will be granted.
As to avoidance, the undisputed facts in this matter establish that the TAMO transfers satisfy all four elements required under § 549(a). First, monthly payments totaling at least $ 46,991.36 under the Auxiliary Plan were delivered to a bank account controlled by TAMO, and TAMO subsequently received those funds. (O'Malley Resp. to Tr.'s Stmt. of Undisputed Facts, Dkt. No. 103, ¶¶ 37 & 38.) Second, as proceeds of the non-exempt Auxiliary Plan, those payments were property of the bankruptcy estate. See 11 U.S.C. § 541(a)(6). Third, the transfers occurred between September 1, 2015 and August 1, 2016, more than two years after the commencement of the case. (O'Malley Resp. to Tr.'s Stmt. of Undisputed Facts, Dkt. No. 103, at ¶ 38.) Finally, neither the Court nor the Bankruptcy Code authorized the transfers to TAMO. (Id. ¶ 39.) Accordingly, the TAMO transfers totaling at least $ 46,991.36 will be avoided.
As for recovery pursuant to § 550, the Trustee is entitled to recover, from TAMO as the initial transferee and from Zellmer and O'Malley as the subsequent transferees, all monies transferred to TAMO, plus prejudgment interest, calculated in accordance with 28 U.S.C. § 1961 and accrued from the respective dates of the Trustee's turnover demands.[20]
Section 550(a) sets forth the parties from whom avoided transfers can be recovered. 11 U.S.C. § 550(a). Pursuant to § 550(a), a trustee may recover from the "initial transferee," the entity for whose benefit the transfer was made, or subsequent transferees. Id. Although the trustee can recover from any combination of these entities, she is entitled to "only a single satisfaction." 11 U.S.C. § 550(d) ; see, e.g. , VN Deprizio Constr. Co. , 874 F.2d at 1194 ; Bonded Fin. Servs., Inc. v. European Am. Bank , 838 F.2d 890, 896 (7th Cir. 1988) ; see also 5 Collier on Bankruptcy ¶ 550.01 (Richard Levin & Henry J. Sommer eds., 16th ed.) (explaining that the trustee is generally prevented by § 550(d) from "obtaining a windfall for the estate by recovering from multiple transferees so that the total recovery is in excess of the value of the property transferred").
The Code does not define "transferee." The Seventh Circuit has explained, however, that a "transferee" has "dominion over the money or other asset, the right to put the money to one's own purposes." Bonded Fin. Servs. , 838 F.2d at 893. The "initial transferee" is "the first entity to have such a dominion or right." CLC Creditors' Grantor Tr. v. Howard Sav. Bank (In re Commercial Loan Corp.) , 396 B.R. 730, 742 (Bankr. N.D. Ill. 2008). An "immediate or mediate transferee," in turn, is "one who takes in a later transfer down the chain of title or possession." Grochocinski v. Knippen (In re Knippen) , 355 B.R. 710, 728 (Bankr. N.D. Ill. 2006) (internal quotation omitted), aff'd , No. 07 C 1697, 2007 WL 1498906 (N.D. Ill. May 18, 2007).
The parties here do no dispute that the monthly payments totaling at least $ 46,991.36 were delivered to and received by *657 TAMO or that TAMO was the first entity to have dominion over the funds. Thus, the Trustee can recover the amount of the avoided transfers from TAMO as the initial transferee.
The Trustee can also recover those transfers from O'Malley and Zellmer as immediate or mediate transferees. It is uncontested that Zellmer is the sole member of TAMO and that she was in control of TAMO at all times relevant to this adversary proceeding. There is also no genuine issue of material fact that both O'Malley and Zellmer used the funds, Zellmer applying them to pay household bills, taxes, and other personal expenses.[21] As a result, O'Malley and Zellmer took the funds from TAMO in later transfers down the chain of possession.
For the foregoing reasons, the Trustee is entitled to both avoidance and recovery of the TAMO transfers. As to the latter, the Trustee may recover a total of at least $ 46,991.36, plus prejudgment interest, from both TAMO as the initial transferee and O'Malley and Zellmer as subsequent transferees. The parties are directed to calculate the prejudgment interest according to the dates of the Trustee's demand letters: July 14, 2016 as to Zellmer and TAMO and August 5, 2016 as to O'Malley. The Trustee's motion for summary judgment on Count IV will be granted.
Count II: Turnover of the Proceeds of the Auxiliary Plan
In Count II of the complaint, the Trustee seeks turnover of the proceeds of the Auxiliary Plan from MetLife, O'Malley, Zellmer, and TAMO pursuant to § 542(a).[22] The Trustee is entitled to turnover of those proceeds, and thus summary judgment will be entered in her favor as to Count II.
Under § 542, "an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363" of the Code "shall deliver to the trustee, and account for, such property or the value of such property." 11 U.S.C. § 542(a). Turnover under § 542(a) is the remedy to obtain property of the bankruptcy estate, but it is not intended to resolve disputes over rights to the property. Roti , 271 B.R. at 291. The trustee bears the burden to show that the asset in question belongs to the estate. Id. Notably, § 542(a) turnover "plainly applies to estate property that was possessed by anyone 'during the case,' whether or not [he or she] still ha[s] it."
*658 Redfield v. Peat, Marwick, Mitchell & Co. (In re Robertson) , 105 B.R. 440, 457 (Bankr. N.D. Ill. 1989) (quoting § 542(a) ).
A. The Trustee Steps into O'Malley's Shoes.
As discussed above, the Trustee steps into O'Malley's shoes in connection with the proceeds of the Auxiliary Plan, succeeding to O'Malley's rights, with her interest in the plan limited to the same extent as O'Malley's interest. See Sanders , 969 F.2d at 593. It is undisputed that O'Malley did not have immediate access to all proceeds under the Auxiliary Plan. Rather, the parties agree that O'Malley was entitled to monthly payments under the plan, and those payments commenced on August 1, 2015. Thus, the Trustee is entitled to the monthly payments that were available to O'Malley.
B. Turnover Is Warranted Under § 542(a).
As determined in Count I, the proceeds of the Auxiliary Plan belong to the bankruptcy estate. Therefore, under § 542(a), any party in possession, custody, or control of the proceeds must account for and deliver them to the Trustee. See 11 U.S.C. § 542(a). There is no genuine issue of material fact that MetLife, O'Malley, Zellmer, and TAMO were all in possession, custody, or control of the proceeds during the case. As a result, they must turn over the proceeds to the Trustee.
It is undisputed that MetLife administers the Auxiliary Plan and has been and continues to be in possession, custody, or control of the plan proceeds. In fact, MetLife has been accounting for, holding, and depositing the proceeds of the Auxiliary Plan with the Trustee since August 2016, shortly after the Trustee demanded their turnover. (MetLife Add'l Facts, Dkt. No. 108, ¶¶ 15 & 16.) Thus, the Trustee is entitled to the turnover of the proceeds of the Auxiliary Plan from MetLife under the default 50% contingent survivor annuity payment option. As for O'Malley, the uncontested facts establish that he directed MetLife to send proceeds of the Auxiliary Plan totaling at least $ 46,991.36 to a TAMO bank account. Thus, he was in control of the proceeds for purposes of § 542(a). Finally, there is no genuine dispute that Zellmer and TAMO controlled the proceeds deposited into the TAMO account. Accordingly, the Trustee is entitled to the turnover of the proceeds totaling at least $ 46,991.36 from O'Malley, Zellmer, and TAMO as well.
Count V: Willful Violation of the Automatic Stay
Finally, the Trustee seeks damages for O'Malley's, Zellmer's, and TAMO's alleged willful violations of the automatic stay pursuant to § 362(k) and/or the Court's civil contempt power under § 105(a). Because the Court finds as a matter of law that a trustee cannot recover damages under § 362(k) and the circumstances of this case do not warrant the exercise of the Court's civil contempt power under § 105(a), the Trustee's motion for summary judgment on Count V will be denied.[23]
A. The Trustee Is Not Entitled to Recover Damages Under § 362(k).
Once a court has found that a party has willfully violated the automatic stay, awarding damages "to an individual injured under [§] 362[ (k) ] is mandatory *659 rather than discretionary." Martino v. First Nat'l Bank of Harvey (In re Garofalo's Finer Foods, Inc.) , 186 B.R. 414, 437 (N.D. Ill. 1995). Here, the Court finds, as a matter of law, that a trustee is not an "individual" under § 362(k) and is thus not entitled to damages for willful violation of the automatic stay under that statutory provision. Therefore, the Court need not address whether the actions of any of the defendants constituted willful violation of the stay.
Section 362(k) allows the award of damages only to "an individual injured by any willful violation of a stay." 11 U.S.C. § 362(k)(1). There is a split of authority as to whether a trustee is an "individual" for purposes of § 362(k), and the Seventh Circuit has not yet weighed in on the question. See In re Morris Senior Living, LLC , Nos. 13 C 2457 & 13 C 2064, 2013 WL 5753834, at *10 (N.D. Ill. Oct. 22, 2013). Even the courts within the Northern District of Illinois disagree on the issue. See Gecker v. Gierczyk (In re Glenn) , 379 B.R. 760, 762-63 (Bankr. N.D. Ill. 2007) (summarizing cases on both sides of the issue under former § 362(h) (the precursor to § 362(k) ); see, e.g. , Paloian v. Grupo Serla S.A. de C.V. , 433 B.R. 19, 41 (N.D. Ill. 2010) (holding that the trustee is not an "individual" under former § 362(h) ); but see Garofalo's Finer Foods , 186 B.R. at 439 (holding that the trustee is an "individual" under former § 362(h) ). The Court agrees with the opinions finding that a trustee is not an "individual" for purposes of § 362(k).
The Code does not define "individual." Former § 362(h) stated that "[a]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(h) (2004) (emphasis added). Current § 362(k) adopted in paragraph (1) the language of former § 362(h) above and then added a second paragraph as follows:
(2) If such violation [of a stay] is based on an action taken by an entity in the good faith belief that subsection (h) applies to the debtor, the recovery under paragraph (1) of this subsection against such entity shall be limited to actual damages.
11 U.S.C. § 362(k)(2) (emphasis added).
The Code defines the term "entity," as used in § 362(k)(2), to include "person , estate, trust, governmental unit, and United States trustee." 11 U.S.C. § 101(15) (emphasis added). The Code's definition of "person," in turn, includes "individual , partnership, and corporation." 11 U.S.C. § 101(41) (emphasis added). Based on these definitions, "entity" and "person" are more inclusive than "individual." In enacting § 362(k), Congress kept the restrictive term "individual" in § 362(k)(1) but added the more inclusive term "entity" in § 362(k)(2). Adding "entity" in close proximity to "individual" strongly suggests that Congress "was aware of the distinction between the terms and deliberately chose to retain" the more narrow term "individual" in the new § 362(k)(1) to refer to a human being or natural person rather than a legal "entity." Glenn , 379 B.R. at 763-64.
Furthermore, a trustee is not an "individual" for purposes of § 362(k). As the representative of the bankruptcy estate, she cannot suffer any damages as an "individual." Rather, damages, such as costs and attorneys' fees, are incurred by the bankruptcy estate. See Morris Senior Living , 2013 WL 5753834, at *10 ; see also Havelock v. Taxel (In re Pace) , 67 F.3d 187, 193 (9th Cir. 1995).
Accordingly, the Court concludes that a trustee is not an "individual" under *660 § 362(k). As such, the Trustee cannot recover damages under that statutory provision, and her request for damages under § 362(k) will be denied.
B. The Trustee Is Not Entitled to Recover Damages Under § 105(a).
Alternatively, the Trustee urges the Court to award damages using its civil contempt power under § 105(a). The Trustee's request will be denied because the circumstances of this case do not warrant either an order of contempt or an award of damages.
Bankruptcy courts have the equitable power of civil contempt under § 105(a). In re Whitlock-Young , 571 B.R. 795, 810 (Bankr. N.D. Ill. 2017) (citing Cox v. Zale Delaware, Inc. , 239 F.3d 910, 916-17 (7th Cir. 2001) ). The party requesting sanctions pursuant to civil contempt bears the burden of showing that such sanctions are appropriate. Id. Notably, "the decision [of] whether or not to award damages for contempt is discretionary and not mandatory as it is under section 362 [k]." A & J Auto Sales, Inc. v. United States (In re A & J Auto Sales, Inc.) , 210 B.R. 667, 671 (Bankr. D.N.H. 1997) (declining to award damages for civil contempt though finding that the defendant willfully violated the stay), aff'd , 223 B.R. 839 (D.N.H. 1998).
Given the complexity and difficulty of the legal questions involved in this matter, and the Trustee's delay in litigating issues related to the Auxiliary Plan, the Court will not invoke its equitable civil contempt power to award damages under § 105(a).
CONCLUSION
For the foregoing reasons, the Trustee's motion for summary judgment will be granted, and O'Malley's cross-motion denied, as to Counts I, II, III, and IV of the complaint, and the Trustee's motion will be denied, and O'Malley's cross-motion granted, as to Count V. Count VI will be dismissed by the Court sua sponte. A separate order will be entered consistent with this Memorandum Opinion.

The deadline for filing proofs of claim was May 27, 2014.

Unless otherwise noted, docket references in this Memorandum Opinion are to Adv. No. 16-00552.

MetLife states that the operative version of the Auxiliary Plan was effective January 1, 2007, while the version filed by the Trustee has an effective date of June 30, 2006. (MetLife Resp. to Tr.'s Stmt. of Undisputed Facts, Dkt. No. 108, ¶ 15.) Although there are no material differences between the two versions of the Auxiliary Plan, the Court includes citations to both in this Memorandum Opinion.

Zellmer and TAMO also assert that the Trustee's action is time-barred. For the sake of simplicity, the Court refers only to O'Malley in connection with this argument.

Unless otherwise noted, all statutory and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1532, and the Federal Rules of Bankruptcy Procedure.

The Court notes that just above the listed single plan on schedule C, O'Malley itemized "Interests in Insurance Policies," detailing each of five insurance policies claimed as exempt. (Am. Sch. C, Bankr. No. 13-10864, Dkt. No. 35, at 5.)

In interpreting § 12-1006(a), the Jokiel court seemed to rely on the difference between the terms "as defined in" and "qualif[ied]" under. 453 B.R. at 747. Other courts have relied on similar distinctions when interpreting exemption statutes. See, e.g. , Gladwell v. Reinhart (In re Reinhart) , 267 P.3d 895, 898-900 (Utah 2011) (finding that the phrase "described in" in the Utah exemption statute covers retirement plans that are not technically tax-qualified under the Internal Revenue Code and emphasizing that the phrase "described in" is broader than the phrase "qualified under").

Zellmer and TAMO try to discredit Jokiel by alleging that the court based its holding on In re Ellis , 274 B.R. 782, 787 (Bankr. S.D. Ill. 2002), and that the "Ellis court's holding that Section 12-1006 ... applies [only] to 'tax-qualified' plans was dictum." (Zellmer & TAMO Resp., Dkt. No. 102, at 10.) This argument is meritless because Jokiel 's holding did not rely on Ellis but merely cited the case as an example.

Zellmer and TAMO argue that another Seventh Circuit case, Wittman v. Koenig , 831 F.3d 416 (7th Cir. 2016), is relevant here. That argument is erroneous. Wittman interpreted a Wisconsin exemption statute, not a statute under Illinois law. See id. at 418-19. Moreover, the Wisconsin statute in Wittman uses completely different language from the text in § 12-1006(a). Id. Specifically, the Wisconsin statute exempts annuities or other retirement benefits that "compl[y] with" the provisions of the Internal Revenue Code. Id. at 420 & n.2.

Zellmer and TAMO similarly argue that Illinois' decision to opt out of the federal exemption scheme signals an expansion of the scope of the exemption of pension plan payments provided under § 522(d)(10)(E) of the Code. (Zellmer & TAMO Resp., Dkt. No. 102, at 7-8.)

Notably, the Traditional Plan provides that it is intended to comply with "the requirements of the Internal Revenue Code governing tax qualified pension plans." (Traditional Plan, Dkt. No. 92-6, at 3.)

In contrast, § 12-1006 unambiguously states that it "applies to interests in retirement plans held by debtors subject to bankruptcy." 735 ILCS 5/12-1006(d).

The Court addresses Count II (turnover) after deciding Counts III and IV (avoidance and recovery) because only an entity "in possession, custody, or control" of property of the estate during the case is subject to a turnover order, and turnover "is not intended as a remedy to determine disputed rights of parties to property." Helms v. Roti (In re Roti) , 271 B.R. 281, 291 (Bankr. N.D. Ill. 2002), aff'd sub nom. Nelmark v. Helms , No. 02 C 0925, 2003 WL 1089363 (N.D. Ill. Mar. 11, 2003).

In Count III of the complaint, the Trustee asks the Court to avoid the Payment Election and restore her "right to elect a payment option that maximizes the value of the" Auxiliary Plan "for the [e]state." (Tr. Compl., Dkt. No. 1, at 10.) Although the Court finds that the Trustee may not elect an alternative payment option, summary judgment will be entered in her favor as to Count III because the Payment Election may be avoided as a matter of law and that avoidance restores the Trustee's right to elect a payment option.

Section 549(a) provides as follows:
Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate-
(1) that occurs after the commencement of the case; and
(2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
(B) that is not authorized under this title or by the court.
11 U.S.C. § 549(a).

Section 550(a) provides, in relevant part, as follows:
Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 549 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from-
(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.
11 U.S.C. § 550(a).

In her reply to MetLife, the Trustee argues for the first time that O'Malley's unauthorized post-petition transfer was void ab initio because it was made in violation of the automatic stay. (Tr. Reply to MetLife, Dkt. No. 122, at 7-8.) An argument raised for the first time in a reply brief is waived. Gonzales v. Mize , 565 F.3d 373, 382 (7th Cir. 2009) ; see also Sommerfield v. City of Chi. , No. 06 C 3132, 2012 WL 3779104, at *1 (N.D. Ill. Aug. 31, 2012) (cautioning that "reply briefs are for replying, not for raising new matters or arguments"). Thus, the Court will not address this argument.

The Trustee argues that post-petition marriage should not affect the estate's property rights. (Tr. Reply to O'Malley, Zellmer & TAMO, Dkt. No. 127, at 20-21.) The estate's property rights under the Auxiliary Plan, however, are contingent on the marital status of O'Malley at the time distributions commenced, and bankruptcy law cannot require O'Malley to remain unmarried. Cf. Schechter v. Balay (In re Balay) , 113 B.R. 429, 445 (Bankr. N.D. Ill. 1990) (emphasizing that there are no Code provisions that would allow the trustee to force the termination of the debtor's employment in order to give the trustee immediate access to the debtor's retirement plan interests).

It is well established that a bankruptcy trustee can recover prejudgment interest on an avoidable transfer from the earlier of: (1) the date of the demand letter sent to the recipient of the avoidable transfer, or (2) the filing of an adversary proceeding to avoid the transfer. In re Sentinel Mgmt. Grp. , 398 B.R. 281, 294 (Bankr. N.D. Ill. 2008) ; Rieser v. Randolph Cty. Bank (In re Masters) , 137 B.R. 254, 262 (Bankr. S.D. Ohio 1992) ; Barber v. Lebo (In re Indus. & Mun. Eng'g, Inc.) , 127 B.R. 848, 851 (Bankr. C.D. Ill. 1990).

Zellmer and TAMO failed to file any response to the Trustee's Rule 7056-1 statement of material facts. Thus, the facts in that statement are deemed admitted. Local Bankr. R. 7056-2(B). The Seventh Circuit has upheld strict application of local rules on summary judgment motions, and "[c]ompliance with Local Rules 7056-1 and 7056-2 is not a mere technicality." Vozella v. Basel-Johnson (In re Basel-Johnson) , 366 B.R. 831, 841 (Bankr. N.D. Ill. 2007) (holding that "[b]ecause the [nonmoving parties] failed to comply with Rule 7056-2, all material facts in the [moving party]'s 7056-1 statement [were] deemed admitted").
In his response to the Trustee's Rule 7056-1 statement, O'Malley denies that he and Zellmer used the TAMO funds and asserts that "there is no evidence to support such an allegation." (O'Malley Resp. to Tr.'s Stmt. of Undisputed Facts, Dkt. No. 103, ¶ 40.) Despite these contentions, O'Malley points to no evidence to contradict Zellmer's deposition testimony that she and O'Malley used the TAMO funds. Facts that are denied without evidentiary support for the denials are deemed admitted. Local Bankr. R. 7056-2(B).

Zellmer and TAMO waived arguments opposing Count II by failing to raise them in their response. See Nichols v. Mich. City Plant Planning Dep't , 755 F.3d 594, 600 (7th Cir. 2014).

O'Malley, Zellmer, and TAMO waived arguments opposing Count V by failing to raise them in their response. See Nichols , 755 F.3d at 600. Nevertheless, the Court can grant summary judgment as to Count V only if the Trustee shows that there is no genuine issue of material fact and that she is entitled to judgment as a matter of law. See Zoretic v. Darge , 832 F.3d 639, 643 (7th Cir. 2016).